## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

**Andrea Harrison**, individually and as
guardian and next friend to minor
Plaintiff L.H.,

                       Plaintiff,

     v.

**Meta Platforms, Inc., Instagram,
LLC, Siculus, Inc.,**

                 Defendants.

Case No.: 22-cv-12038

## **COMPLAINT**

## TABLE OF CONTENTS

I.  INTRODUCTION ........................................................................1

II.  JURISDICTION AND VENUE ........................................................6

III.  PARTIES ........................................................................................8

IV.  GENERAL FACTUAL ALLEGATIONS ......................................9

V.  PLAINTIFF-SPECIFIC ALLEGATIONS ....................................26

VI.  CAUSES OF ACTION................................................................28

VII.  TIMELINESS AND TOLLING OF STATUTES OF LIMITATIONS .....119

VIII. DEMAND FOR A JURY TRIAL ...............................................119

IX.  PRAYER FOR RELIEF .............................................................120

## I.     INTRODUCTION

1.     Over the last two decades, more and more of our lives have moved onto social media platforms and other digital public spaces. In this vast, still largely unregulated universe of digital public spaces, which are privately owned and primarily run for profit, there exists tension between what is best for technology companies' profit margins and what is best for the individual user (especially the predictable adolescent user) and for society. Business models are often built around maximizing user engagement, not to ensure that users engage with the platform and one another in safe and healthy ways. Technology companies focus on maximizing time spent, not time well spent. In recent years, there has been growing concern about the impact of digital technologies, particularly social media, on the mental health and wellbeing of children and adolescents. Many researchers argue that social media facilitates cyberbullying, contributes to obesity and eating disorders, instigates sleep deprivation to achieve around-the-clock platform engagement, encourages children to negatively compare themselves to others and develop a broad discontentment for life, and has been connected to depression, anxiety, self-harm, and ultimately suicide ideation, suicide attempts, and completed suicide.

2.     This matter arises from an egregious breach of the public trust by Defendant Meta Platforms, Inc. ("Meta"). Meta was originally incorporated in Delaware on July 29, 2004, as "TheFacebook, Inc." On September 20, 2005, the company changed its name to "Facebook, Inc." On October 28, 2021, the company assumed its current designation. While Plaintiff has attempted to identify the specific Meta subsidiary(s) that committed each of the acts alleged in this

Complaint, Plaintiff was not always able to do so, in large part due to ambiguities in Meta's and its subsidiaries' own documents, public representations, and lack of public information. However, upon information and belief, Meta oversees the operations of its various platforms and subsidiaries, some of which have been identified and are listed below. For this reason, unless otherwise specified, the shorthand "Meta" contemplates the apparent control that Defendant Meta Platforms, Inc. wields over the subject social networks' overall operations and, therefore, further refers to its various subsidiaries and predecessors. To the extent this assumption is incorrect, the knowledge of which Meta subsidiary, current or former, is responsible for specific conduct is knowledge solely within Defendants' possession, the details of which Plaintiff should be permitted to elucidate during the discovery phase.

3.     Meta knowingly exploited its most vulnerable users—children throughout the world—to drive corporate profit. Meta operates the world's largest family of social networks, enabling billions of users worldwide to connect, view, and share content through mobile devices, personal computers, and virtual reality headsets. A user does not have to pay to create an account. Instead of charging account holders to access the platform, Meta became one of the world's most valuable companies from the sale of advertisement placements to marketers across its various platforms and applications. For example, upon information and belief, Meta generated $69.7 billion from advertising in 2019, more than 98% of its total revenue for the year. Meta can generate such revenues by marketing its user base to advertisers. Meta collects and analyzes data to assemble virtual dossiers on its users,

covering hundreds if not thousands of user-specific data segments. This data collection and analysis allows advertisers to micro-target advertising and advertising dollars to very specific categories of users, who can be segregated into pools or lists using Meta's data segments. Only a fraction of these data segments come from content that is explicitly designated by users for publication or explicitly provided by users in their account profiles. Many of these data segments are collected by Meta through surveillance of each user's activity on the platform and off the platform, including behavioral surveillance that users are not even aware of, like navigation paths, watch time, and hover time. At bottom, the larger Meta's user database grows, the more time the users spend on the database, and the more detailed information that Meta can extract from its users, the more money Meta makes.

4. Defendants have intentionally designed their product to maximize users' screen time, using complex algorithms designed to exploit human psychology and driven by advanced computer algorithms and artificial intelligence available to two of the largest technology companies in the world. Defendants have progressively modified their product to promote problematic and excessive use that they know threatens the actuation of addictive and self-destructive behavioral patterns.

5. One Meta product, www.Instagram.com ("Instagram") websites and respective interrelated app ranks among the most popular social networking product, with more than two billion combined users worldwide. It is estimated that nine out of ten teens use social media platforms, with the average teen using the

3

platform roughly three hours per day. Given the delicate, developing nature of the teenage brain and Meta's creation of social media platforms designed to be addictive, it comes as no surprise that we are now grappling with the ramifications of Meta's growth-at-any-cost approach, to wit, a generation of children physiologically entrapped by products the effects of which collectively result in long-lasting adverse impact on their rapidly evolving and notoriously precarious mental health.

6.      Instagram has become the most popular photo sharing social media platform amongst teenagers and young adults in the United States, with over 57 million users below the age of eighteen, meaning that 72 percent of America's youth use Instagram.

7.      A user's "feed" on Instagram is comprised of an endless series of photos, videos, text captions, and comments posted by accounts that the user follows, along with advertising and content specifically selected and promoted by Instagram.

8.      Instagram also features a "discover" page where a user is shown an endless feed of content that is selected by an algorithm designed by Instagram based upon the users' data profile: demographics, prior activity in the platform, and other data points.

9.      Over the past decade or so, Meta has added features and promoted the use of auto playing short videos and temporary posts on Instagram referred to as Instagram "Stories".

10.     Instagram notifies users through text and email of activity that might be of interest, which is designed to and does prompt users to open Instagram and be exposed to content selected by the platform to maximize the length of time and amount of content viewed by the user. Instagram include many other harm causing features, as discussed below.

11.     Plaintiff brings claims of strict liability based upon Defendants' defective design of social media products that renders it not reasonably safe for ordinary consumers in general and children in particular. It is technologically feasible to design a social media product that substantially decrease the incidence and magnitude of harm to ordinary consumers and children arising from their foreseeable use of Defendants' product with a negligible increase in production cost.

12.     Plaintiff also brings claims for strict liability based on Defendants' failure to provide adequate warnings to adolescent users and their parents of the danger of mental, physical, and emotional harms arising from the foreseeable use of their social media product.

13.     Plaintiff also brings claims for common law negligence arising from Defendants' unreasonably dangerous social media product and their failure to warn of such dangers. Defendants knew or, in the exercise of ordinary care, should have known that their social media product were harmful to a significant percentage of their adolescent users and failed to re-design their product to ameliorate these harms or warn adolescent users and their parents of dangers arising out of the foreseeable use of their product. Defendants intentionally created an attractive nuisance to

children, but simultaneously failed to provide adequate safeguards from the harmful effects they knew were occurring.

14.     The addictive qualities of Defendants' product and their harmful algorithms are not fully known or appreciated by adolescent users or their parents. Like others, Plaintiff only recently learned the truth about Meta's increasingly detrimental effect on teenagers when Frances Haugen, a former Facebook employee turned whistleblower, came forward with internal documents showing that Meta was aware that its platform and products cause significant harm to its users, especially children, especially children. Rather than making meaningful changes to safeguard the health and safety of its adolescent users, Meta has consistently chosen to prioritize profit over safety by continuing to implement and require its users to submit to product components that increase the frequency and duration of users' engagement, resulting in the pernicious harms described in greater detail below.

## II.     JURISDICTION AND VENUE

15.     This Court has subject-matter jurisdiction over this case under 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000 and Plaintiff and Defendants are residents of different states.

16.     This Court has specific personal jurisdiction over Defendants Instagram because these Defendants transact business in the State of Michigan and purposely avail themselves of the benefits of transacting business with Michigan residents. Plaintiff's claims set forth herein arise out of and/or relate to Defendants' activities in the State of Michigan and purposeful availment of the benefits of

transacting business here and the exercise of personal jurisdiction by this Court comports with traditional notions of fair play and substantial justice.

17.     Defendants interface with a significant percentage of the population of the State of Michigan relating to use of the product at issue in this case, and interact extensively with—send messages, notifications, and communications to—and provide a myriad of other interactive services and recommendations to users Defendants expect and know to be in the State of Michigan.

18.     Defendants advertise extensively in Michigan, through contractual relationships with third-party "partners" who advertise on their behalf via electronic and internet-based platforms and devices. Meta also has agreements with cell phone manufacturers and/or providers and/or retailers, who often pre-install its product on mobile devices prior to sale and without regard to the age of the intended user of each such device. That is, even though Defendants are prohibited from providing their product to users under the age of 13, by encouraging and allowing its product to be installed indiscriminately on mobile devices, it actively promotes and provides access to its product to the underage users in Michigan  for whom those devices are intended.

19.     Defendants have earned millions of dollars in annual revenue from their Michigan related activities over the last several years arising from their defective and inherently dangerous social media product by Michigan  residents, including Plaintiff.

20.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in the Eastern District of Michigan.

## III.   PARTIES

### A.   **Plaintiff**

21.     Plaintiff Andrea Harrison is currently individual residing in Hartland, Michigan and is the mother and custodial parent of her thirteen-year-old daughter L.H.. All events giving rise to Plaintiff's claims—including her initial exposure to Instgram, the onset of her addiction, and her injuries as a result of her use of Instgram —occurred while she resided within the State of Michigan. Plaintiff brings this suit on behalf of herself and L.H.., pursuant to FED. R. CIV. P. 17.

### B.   **Defendant Meta Platforms, Inc.**

22.     Meta is a Delaware corporation and multinational technology conglomerate, having its principal place of business in Menlo Park, California.

23.     Meta develops and maintains social media platforms, communication platforms, and electronic devices. These platforms and products include Instagram (and its self-titled app), and a line of electronic virtual reality devices called Oculus Quest (soon to be renamed "Meta Quest"). Meta's subsidiaries include, but may not be limited to: Instagram, LLC (Delaware); Novi Financial, Inc. (Delaware); Runways Information Services Limited (Ireland); Scout Development LLC (Delaware); Siculus, Inc. (Delaware); and a dozen other entities whose identity or relevance is presently unclear.

### C.   **Subsidiary Defendants**

8

24.     Instagram, LLC ("Instagram") was founded by Kevin Systrom and Mike Krieger in October 2010. In April 2021, Meta purchased the company for $1 billion (later statements from Meta have indicated the purchase price was close to $2 billion). Meta reincorporated the company on April 7, 2012, in Delaware. Currently the company's principal place of business is in Menlo Park, CA. Instagram is a social media platform tailored to photo and video sharing.

25.     Siculus, Inc., ("Siculus") was incorporated in Delaware on October 19, 2011 and is a wholly owned subsidiary of Meta. Siculus supports Meta platforms by constructing data facilities and other projects. Siculus's principal place of business is in Menlo Park, CA.

## IV.   GENERAL FACTUAL ALLEGATIONS

### A.   Teenagers Are Particularly Vulnerable to the Perils of Excessive Social Media Use.

26.     Emerging research shows that the human brain is still developing during adolescence in ways consistent with children and adolescents' demonstrated psychosocial immaturity. Specifically, children and adolescents' brains are not yet fully developed in regions related to risk evaluation, emotion regulation, and impulse control. The frontal lobes—and, in particular, the prefrontal cortex—of the brain play an essential part in higher-order cognitive functions, impulse control, and executive decision-making. These regions of the brain are central to the process of planning and decision-making, including the evaluation of future consequences and the weighing of risk and reward. They are also essential to the ability to control emotions and inhibit impulses. MRI studies have shown that the prefrontal cortex is one of the last regions of the brain to mature. During childhood and adolescence,

9

the brain is maturing in at least two major ways. First, the brain undergoes myelination, the process through which the neural pathways connecting different parts of the brain become insulated with white fatty tissue called myelin. Second, during childhood and adolescence, the brain is undergoing "pruning"—the paring away of unused synapses, leading to more efficient neural connections. Through myelination and pruning, the brain's frontal lobes change to help the brain work faster and more efficiently, improving the "executive" functions of the frontal lobes, including impulse control and risk evaluation. This shift in the brain's composition continues throughout adolescence and into young adulthood. In late adolescence, important aspects of brain maturation remain incomplete, particularly those involving the brain's executive functions and the coordinated activity of regions involved in emotion and cognition. As such, the part of the brain that is critical for control of impulses and emotions and mature, considered decision-making is still developing during adolescence, consistent with the demonstrated behavioral and psychosocial immaturity of juveniles.

27.     Because adolescence is the period when sophisticated, essential inhibitory control functions are being established, the onset of prolonged exposure to toxic content during adolescence is particularly concerning. The extended development of the prefrontal cortex results in an adolescent brain that is largely undeveloped, highly malleable, and overwhelmingly vulnerable to long-term, irremediable effects of adverse influences, including addiction and a fractured psychological well-being.

28.     The algorithms in Defendants' social media products exploit adolescent users' diminished decision-making capacity, impulse control, emotional maturity, and psychological resiliency caused by users' incomplete brain development. Defendants know, or in the exercise of reasonable care should know, that because their adolescent users' frontal lobes are not fully developed, such users are much more likely to sustain serious physical and psychological harm through their social media use than adult users. Nevertheless, Defendants have failed to design their products with any protections to account for and ameliorate the psychosocial immaturity of their adolescent users.

29.     Children and adolescents see themselves as increasingly unique. Paradoxically, as part of their individuation, they conform by faithfully mimicking the behavior of peers. Indeed, in defining their own emerging identity, children and adolescents aspire to be viewed as mature adults, and this leads them to affiliate with and emulate the personalities, images, behaviors, and preferences of those that they would like to become. During the teenage years, relationships with family members often take a back seat to peer groups and appearance. Teens crave to identify with their peer group, achieve social approval, and become "popular." Many teens feel deep insecurity and are self-conscious. They feel people are constantly focused on them, examining them, and judging them about everything they say and do. They struggle with the inexorable desire to be accepted and admired by their teen peers, and their biggest fear is to not fit in. This myopic desire to fit in predispositions teenagers to frequently engage in upward social comparison processes, that is, identifying and observing others that appear to be experiencing

more positive outcomes, and consequently feeling worse about themselves and their own perceived shortcomings.

30.     Today's adolescents are part of Generation Z (which is loosely defined as people born between 1997 and 2012)—they are the first generation of consumers to have grown up in an entirely post-digital era, and thus are "digitally native." The oldest members of this demographic cohort are just turning 24 this year; however, the substantial majority are believed to be still going through adolescence. Members of Generation Z spend upwards of 3 hours per day on the internet, and another 3 hours per day using social media. According to a 2018 survey by Pew Research Center, 45 percent of high school students said they used a social-media platform daily, and 24 percent said that they were online "almost constantly."[1]

31.     One way that Meta's platforms addict children and adolescents is as follows: When children and adolescents use design features such as "likes" it causes their brains to release euphoria-causing dopamine. However, as soon as dopamine is released, their euphoria is countered by dejection: adolescent users' brains adapt by reducing or "downregulating" the number of dopamine receptors that are stimulated. In normal stimulatory environments, neutrality is restored after this dejection abates. However, Defendants' algorithms are designed to exploit users' natural tendency to counteract dejection by going back to the source of pleasure for another dose of euphoria.

---

[1] Monica Anderson and JingJing Jiang, *Teens, Social Media and Technology* (February 3, 2022, last visited at 11:20 AM CST) https://www.pewresearch.org/internet/2018/05/31/teens-social-media-technology-2018/.

32.     Eventually, as this pattern continues over a period of days, weeks, and months, the neurological baseline to trigger adolescent users' dopamine responses increases. Children and adolescents then continue to use Instagram, not for enjoyment, but simply to feel normal. When adolescent users attempt to stop using Defendants' social media products, they experience the universal symptoms of withdrawal from any addictive substance including anxiety, irritability, insomnia, and craving.

33.     Addictive use of social media by children and adolescents is psychologically and neurologically analogous to addiction to internet gaming disorder. Gaming addiction is a recognized in the American Psychiatric Association's 2013 Diagnostic and Statistical Manual of Mental Disorders (DSM-5) (used by mental health professionals to diagnose mental disorders) and is a recognized mental health disorder by the World Health Organization and International Classification of Diseases. The diagnostic symptoms of social media addiction among children and adolescents are the same as the symptoms of addictive gaming promulgated in DSM 5 and include:

> a.  Preoccupation with social media and withdrawal symptoms (sadness, anxiety, irritability) when device is taken away or use is not possible (sadness, anxiety, irritability).
>
> b.  Tolerance, the need to spend more time using social media to satisfy the urge.

c. Inability to reduce social media usages, unsuccessful attempts to quit gaming.

d. Giving up other activities, loss of interest in previously enjoyed activities due to social media usage.

e. Continuing to use social media despite problems.

f. Deceiving family members or others about the amount of time spent on social media.

g. The use of social media to relieve negative moods, such as guilt or hopelessness; and

h. Jeopardizing school or work performance or relationships due to social media usage.

34.     Defendants' advertising profits are directly tied to the amount of time that its users spend online. Thus, Defendants enhance advertising revenue by maximizing users' time online through a product design that addicts them to the platform, in part by directing them to content that is progressively more stimulating. However, reasonable adolescent users and their parents do not expect that online social media platforms are psychologically and neurologically addictive.

35.     Defendants' products could feasibly report the frequency and duration of their adolescent users' screen time to their parents at negligible cost. This would enable parents to track the frequency, time, and duration of their adolescent child's

social media, identify and address problems arising from such use, and better exercise their rights and responsibilities as parents.

36.     Social comparisons on social media are frequent and are especially likely to be upward, as social media provides a continuous stream of information about other people's accomplishments. [2] Past research suggests that social comparisons occur automatically; when individuals encounter information about another person, their own self-perceptions will be affected. The sheer number of posts in a News Feed, each offering a thumbnail sketch of each person's carefully curated and predominantly ostentatious content, yields numerous opportunities for social comparison. Although people do not typically post false information about themselves online, they do engage in selective self-presentation and are more likely to post eye-catching content. As a result, individuals browsing their News Feeds are more likely to see posts about friends' exciting social activities rather than dull days at the office, affording numerous opportunities for comparisons to seemingly better-off others. Individuals with vacillating levels of self-esteem and certitude, characteristics notoriously endemic to the teenage cohort, are particularly oriented to making frequent and extreme upward social comparisons on social media, which in turn threatens their mental health. Social-media-induced social comparison often results in a discrepancy between the ideal self and the real self, thus evoking a sense of depression, deprivation, and distress, resulting in an overall aggravation of one's

---

[2] Jin Kyun Lee, *The Effects of Social Comparison Orientation on Psychological Well-Being in Social Networking Sites: Serial Mediation of Perceived Social Support and Self-Esteem* (2020), https://link.springer.com/content/pdf/10.1007/s12144-020-01114-3.pdf

mental state.[3] Since the early 2000s, studies have shown that frequent upward social comparison results in lower self-esteem and reduced overall mental health.[4] It has also long been known that individuals who are more likely to engage in self-comparison are likewise more likely to have negative outcomes when using social media. To cope with wavering self-esteem, digitally native children and adolescents often become envious of others and resort to cyberbullying to deconstruct the point of comparison's perceived superiority and preserve an increasingly delicate ego. These natural dynamics in youth are exacerbated to psychologically injurious levels by Meta's platforms' progressively toxic environment worsened by its 2018 shift to engagement-based ranking, which is discussed in further detail below.

37.     The dangers associated with teenager's proclivity to engage in protracted upward social comparison while on social media is compounded by Meta's deft and discreet construction of an atmosphere capable of exploiting the impulse control issues of even the most mature adults, thereby unleashing upon the public a product that is predictably highly addictive. Some of Meta's key features that make the platform highly addictive include the use of intermittent variable rewards ("IVR") and its Facial Recognition System ("FRS").

38.     IVR is a method used to addict a user to an activity by spacing out dopamine triggering stimuli with dopamine gaps—a method that allows for

---

[3] This schism between the ideal self and the real self, and the attendant dissatisfaction with reality, is further exacerbated by Meta's use of physical-augmentation technology, which allows users to utilize photo and video filters to make remove blemishes, make the face appear thinner, and lighten the skin-tone, all to make themselves appear more "attractive."

[4] Claire Midgley, *When Every Day is a High School Reunion: Social Media Comparisons and Self-Esteem* (2020), https://www.researchgate.net/publication/342490065_When_Every_Day_is_a_High_School_Reunion_Social_Media_Comparisons_and_Self-Esteem

anticipation and craving to develop and strengthens the addiction with each payout. The easiest way to understand this term is by imagining a slot machine. You pull the lever (intermittent action) with the hope of winning a prize (variable reward). In the same way, you refresh Meta's feeds, endure the brief delay, and then learn if anyone has tagged you in a photo, mentioned you in a post, sent you a message, or liked, commented on, or shared either of your posts. As explained below, Meta spaces out notifications of likes and comments into multiple bursts (dopamine gaps), rather than notifying users in real time, to maximize the platform's addictiveness.

39.     Engineered to meet the evolving demands of the "attention economy,"[5] a term used to describe the supply and demand of a person's attention, which is a highly valuable commodity for internet websites, in February 2009, Meta introduced perhaps its most conspicuous form of IVR: its "Like" button; Instagram launched that same year and came ready-made with a like function shaped as a heart. Additional features of Meta's IVR include its delay-burst notification system, comments, posts, shares, and other dopamine-triggering content. Instagram's notification algorithm delays notifications to deliver them in spaced-out, larger bursts. These designs take advantage of users' dopamine-driven desire for social validation and optimizes the balance of negative and positive feedback signals to addict users.

---

[5] The business model is simple: The more attention a platform can pull from its users, the more effective its advertising space becomes, allowing it to charge advertisers more.

40.    Other psychological manipulations used to intertwine social media users include, but are not limited to: (1) the FRS system, which has already collected for distribution to various third parties a billion individual facial recognition templates and is otherwise used by Meta to tag people in photos; (2) Meta's use of wavy dots to reflect that someone is currently writing you a message, which is designed to keep you on the platform until you receive the message or shorten the time for you to return and check for a message; and (3) the concept of social reciprocity, a variance of quid pro quo, pursuant to which Meta alerts you when someone has read your message, which encourages the receivers to respond—because the sender knows the message has been read—and simultaneously prompts the sender to return to check for the seemingly inevitable response. In sum, this perilous amalgamation of intense psychological vulnerability and targeted exploitation foreseeably results in an increased risk of a variety of harms for today's youth, including, but not limited to, social media addiction, withdrawal—from friends, family, and social and academic advancement—lack of focus, anxiety, body dysmorphia, eating disorders, death resulting from eating disorders, depression, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, self-harm, and suicide among other harms.

B.    **Meta Knowingly Exploits Teenage Vulnerabilities for Unjust Gain.**

41.    Enacted in 1998 and finalized by a U.S. Federal Trade Commission rulemaking in 2000, the Children's Online Privacy Protection Act, or "COPPA," regulates the conditions under which commercial web sites that either target children under age 13 or have actual knowledge of children under age 13 using their

site can collect and use information about them. As a result of COPPA, website operators must obtain "verifiable parental consent" from parents prior to the collection and use of information about children under age 13. Meta has chosen to avoid these obligations by purporting to ban all those younger than 13 through its terms of service.

42.    Meta states that children under the age of thirteen are prohibited from having Meta accounts, but Meta knowingly lacks effective age-verification protocols. Since at least 2011, Meta has known that its age-verification protocols are largely inadequate. The problem has not been remediated, as Meta removed at least six hundred thousand underage users in 2021.

43.    Defendants do not charge their users to use their platforms, but instead receive money from advertisers who pay a premium to target advertisements to specific categories of people as studied and sorted by Meta's algorithms. Thus, Defendants generate revenue based upon the total time spent on the application, which directly correlates with the number of advertisements that can be shown to each user.

44.    Meta, as originally conceived, ostensibly functioned like an enormous virtual bulletin board, where content was published by authors. But Meta has evolved over time with the addition of numerous features and products designed by Meta to engage users. The earliest of these—the search function and the "like" button—were primarily user-controlled features. In more recent years, however, Meta has taken a more active role in shaping the user-experience on the platform with more complex features and products. The most visible of these are curated

recommendations, which are pushed to each user in a steady stream as the user navigates the website, and in notifications sent to the user's smartphone and email addresses when the user is disengaged with the platform. These proprietary Meta products include News Feed (a newsfeed of stories and posts published on the platform, some of which are posted by your connections, and others that are suggested for you by Meta), People You May Know (introductions to persons with common connections or background), Suggested for You, Groups You Should Join, and Discover (recommendations for Meta groups to join). These curated and bundled recommendations are developed through sophisticated algorithms. As distinguished from the earliest search functions that were used to navigate websites during the Internet's infancy, Meta's algorithms are not based exclusively on user requests or even user inputs. Meta's algorithms combine the user's profile (e.g., the information posted by the user on the platform) and the user's dossier (the data collected and synthesized by Meta to which Meta assigns categorical designations), make assumptions about that user's interests and preferences, make predictions about what else might appeal to the user, and then make very specific recommendations of posts and pages to view and groups to visit and join based on rankings that will optimize Meta's key performance indicators.

45.     Equipped with ample information about the risks of social media, the ineffectiveness of its age-verification protocols, and the mental processes of teens, Meta has expended significant effort to attract preteens to its products, including substantial investments in designing products that would appeal to children ages 10-to-12. Meta views pre-teens as a valuable, unharnessed commodity, so valuable

that it has contemplated whether there is a way to engage children during play dates.[6] Meta's unabashed willingness to target children, in the face of its conscious, long-standing, plainly deficient age-verification protocols demonstrates the depths to which Meta is willing to reach to maintain and increase its profit margin.

46.     Faced with the potential for reduction in value due to its declining number of users, in or around early 2018, Meta (and likely Meta 2) revamped its interface to transition away from chronological ranking, which organized the interface according to when content was posted or sent, to prioritize Meaningful Social Interactions, or "MSI," which emphasizes users' connections' interactions, e.g., likes and comments, and gives greater significance to the interactions of connections that appeared to be the closest to users. To effectuate this objective, Facebook developed and employed an "amplification algorithm" to execute engagement-based ranking, which considers a post's likes, shares, and comments, as well as a respective user's past interactions with similar content, and exhibits the post in the user's newsfeed if it otherwise meets certain benchmarks. The algorithm covertly operates on the proposition that intense reactions invariably compel attention. As it measures reactions and contemporaneously immerses users in the most reactive content, and negative content routinely elicits passionate reactions, the algorithm effectively works to steer users toward the most negative content.

47.     Meta CEO Zuckerberg publicly recognized this in a 2018 post, in which he demonstrated the correlation between engagement and sensational content

---

[6] Georgia Wells and Jeff Horwitz, *Facebook's Effort to Attract Preteens Goes Beyond Instagram Kids, Documents Show* (2021), https://www.wsj.com/articles/facebook-instagram-kids-tweens-attract-11632849667

that is so extreme that it impinges upon Meta's own ethical limits, with the following chart:[7]



48.     The algorithm controls what appears in each user's News Feed and promotes content that is objectionable and harmful to many users. In one internal report, Meta concluded that "[o]ur approach has had unhealthy side effects on important slices of public content, such as politics and news," with one data scientist noting that "[t]his is an increasing liability." In other internal memos, Meta concluded that because of the new algorithm, "[m]isinformation, toxicity, and violent content are inordinately prevalent." Other documents show that Meta employees also discussed Meta's motive for changing its algorithm—namely, that users began to interact less with the platform, which became a worrisome trend for Meta's bottom line. Meta found that the inflammatory content that the new algorithm was feeding to users fueled their return to the platform and led to more engagement, which, in turn, helped Meta sell more of the digital ads that generate most of its revenue. All told, Meta's algorithm optimizes for angry, divisive, and

---

[7]   Mark   Zuckerberg,   *A   Blueprint   for   Content   Governance   and   Enforcement*,   FACEBOOK, https://www.facebook.com/notes/751449002072082/ (last visited January 8, 2022).

polarizing content because it'll increase its number of users and the time users stay on the platform per viewing session, which thereby increases its appeal to advertisers, thereby increasing its overall value and profitability.

49.    Upon information in belief, at least as far back as 2019, Meta initiated, inter alia, a Proactive Incident Response experiment, which began researching the effect of Meta on the mental health of today's youth.[8] Meta's own in-depth analyses show significant mental-health issues stemming from the use of Instagram among teenage girls, many of whom linked suicidal thoughts and eating disorders to their experiences on the app.[9] Meta's researchers have repeatedly found that Instagram is harmful for a sizable percentage of teens that use the platform. In an internal presentation from 2019, Meta researchers concluded that "[w]e make body issues worse for one in three teen girls," and "[t]eens blame Instagram for increases in the rate of anxiety and depression." Similarly, in a March 2020 presentation posted to Meta's internal message board, researchers found that "[t]hirty-two percent of teen girls said that when they feel bad about their bodies, Instagram made them feel worse." Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram. Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of "suicide and self-injury" worse. Seventeen percent of teen-girl Instagram users say the

---

[8] *See Protecting Kids Online: Testimony from a Facebook Whistleblower*, United States Senate Committee on Commerce, Science, & Transportation, Sub-Committee on Consumer Protection, Product Safety, and Data Security, https://www.c-span.org/video/?515042-1/whistleblower-frances-haugen-calls-congress-regulate-facebook

[9] *See* Wall Street Journal Staff, *The Facebook Files* (2021), https://www.wsj.com/articles/the-facebook-files11631713039?mod=bigtop-breadcrumb

platform makes "[e]ating issues" worse. Instagram users are twice as likely to develop an eating disorder as those who don't use social media.

50.     Meta is aware that teens often lack the ability to self-regulate. Meta is further aware that, despite the platform's adverse impact to teenage users' well-being, the absence of impulse control often renders teens powerless to oppose the platform's allure. Meta is conscious of the fact that the platform dramatically exacerbates bullying and other difficulties prevalent within the high school experience, as the reach of the same now affects users within the ideally otherwise safe confines of the home. The advent of social media largely occurred after today's parents became adults, the consequence being a large swath of parents that lack the context needed to appreciate the contemporary perils of Meta and Instagram, who are likewise ill-equipped to offer advice sufficient to effectively mitigate against it.

51.     The shift from chronological ranking to the algorithm modified the social networking environment in such a way that it created a new iteration of the Meta experience, one that is profoundly more negative, one that exploits some of the known psychological vulnerabilities of Meta's most susceptible patronage, to wit, juveniles, resulting in a markedly enlarged threat to the cohort's mental health and the related frequency of suicidal ideation.

52.     Excessive screen time is harmful to children and adolescents' mental health, sleep patterns, emotional well-being. Defendants' products lack any warnings that foreseeable product use can disrupt healthy sleep patterns, or specific warnings to parents when their child's product usage exceeds healthy levels or occurs during sleep hours, rendering the platform unreasonably dangerous.

Reasonable and responsible parents are not able to accurately monitor their child's screen time because most children and adolescents own or can obtain access to mobile devices and engage in social media use outside their parents' presence.

53.    Meta professes to have implemented protective measures to counteract the well-established dangers of its sites' customized, doggedly harmful content; however, its protocols apply only to content conveyed in English and removes only three-to-five percent of harmful content. Meta knows its quality-control and age-verification protocols are woefully ineffective, but Meta is either unwilling or incapable of properly managing its platforms. This is consistent with its established pattern of recognizing, and subsequently ignoring, the needs of its underage users and its obligation to create a suitable environment accessible only by its age-appropriate users, all in the interest of reaping obscene profit.

C.    **Plaintiff Expressly Disclaims Any and All Claims Seeking to Hold Defendants Liable as the Publisher or Speaker of Any Content Provided, Posted, or Created by Third Parties.**

54.    Plaintiff seeks to hold Defendants accountable for their own alleged acts and omissions. Plaintiff's claims arise from Defendants' status as the designer and marketer of dangerously defective social media products, not as the speaker or publisher of third-party content.

55.    Plaintiff alleges that Defendants failed to warn adolescent users and their parents of known dangers arising from anticipated use of their social media platform. None of Plaintiff's claims rely on treating Defendants as the publisher or speaker of any third-party's words. Plaintiff's claims seek to hold Defendants accountable for their own allegedly wrongful acts and omissions, not for the speech

of others or for any attempts by Defendants to restrict access to objectionable content.

56.     Plaintiff is not alleging that Defendant is liable for what third-parties have said, but for what Defendants did or did not do.

57.     None of Plaintiff's claims for relief set forth herein require treating Defendants as a speaker or publisher of content posted by third parties. Rather, Plaintiff seeks to hold Defendants liable for their own speech and their own silence in failing to warn of foreseeable dangers arising from the anticipated use of their product. Defendants could manifestly fulfill their legal duty to design reasonably safe products and furnish adequate warnings of foreseeable dangers arising out of their products, without altering, deleting, or modifying the content of a single third-party post or communication.

## V.     PLAINTIFF-SPECIFIC ALLEGATIONS

58.     Plaintiff L.H. is a thirteen-year-old girl who is a heavy user of Instagram.

59.     Shortly after registering to use Instagram at the age of eleven, Plaintiff began engaging in addictive and problematic use of the platform(s). L.H. interest in any activity other than viewing and posting on Instagram progressively declined.

60.     Prompted by the addictive design of Defendants' product(s), and the constant notifications that Defendants' platform pushed to L.H. 24 hours a day, L.H. began getting less and less sleep.

61.     As a proximate result of her addiction to Instagram, and specifically due to recommendations and content Defendants selected and showed to, L.H. an

adolescent user of Instagram, L.H. subsequently developed injuries including, but not limited to, anxiety, attempted suicide, attempted self-harm, self-harm, and body dysmorphia.

62.     Defendants have designed Instagram, including through the use of weak age-verification measures and disappearing or time-sensitive messaging features, to frustrate parents like Andrea Harrison from exercising their rights and duties as parents to monitor and limit their children's use of Instagram.

63.     Defendants have designed Instagram to allow children and adolescents to use, become addicted to, and abuse their product without the consent of the users' parents, like Andrea Harrison.

64.     Defendants have specifically designed Instagram to be an attractive nuisance to underage users but failed to exercise the ordinary care owed to underage business invitees to prevent the rampant, foreseeable, and deleterious impact on adolescent users that access Instagram.

65.     Neither Andrea Harrison nor L.H. were aware of the clinically addictive and mentally harmful effects of Instagram when L.H. began to use the product.

66.     Defendants not only failed to warn L.H. and Andrea Harrison of the dangers of addiction, sleep deprivation, and problematic use of Instagram, but misrepresented the safety, utility, and non-addictive properties of their product. For example, the head of Instagram testified under oath at a December 8, 2021, Senate Committee hearing that Instagram does not addict its users.

67.    As a result of  L.H. extensive and problematic use of Instagram, she has developed numerous mental health conditions that she still struggles with until this day.

## VI.    CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### STRICT LIABILITY - DESIGN DEFECT

68.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

69.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

70.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and or benefited from the platform that Plaintiff used.

71.    Instagram was designed and intended to be used as a social media platform.

72.    Instagram as designed was unreasonably dangerous, posed a substantial likelihood of harm, and were therefore defective because of reasons enumerated in the complaint, including, but not limited to, risks of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty

sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

73.   DEFENDANTS defectively designed the platform to specifically appeal to and addict children, adolescents and young adults, who were particularly unable to appreciate the risks posed by the platform, and particularly susceptible to harms from the product.

74.   DEFENDANTS effectively designed the platform to be addictive and take advantage of the chemical reward system of users' brains (especially young users) to create addiction and additional mental and physical health harms.

75.   DEFENDANTS defectively designed Instagram that is inherently dangerous because it included features making the product addictive and likely to cause the mental and physical health harms listed above. These features include, but are not limited to: (1) engagement-based ranking (sorting content on a user's feed based on engagement or "meaningful social interactions" rather than chronology); (2) intermittent variable rewards (a system of "likes", comments, strategically-timed notifications, promoting the content of new users and users who have not posted in a while, among other features); (3) face tracking and augmentation (i.e., photo and video filters designed to make users appear more attractive); (4) endless scrollable content (especially auto-playing video content such as the Instagram "Reels" content feed); (5) the interaction of these features; and (6) other features of the platform which are currently unknown and hidden from users and governments.

76.   DEFENDANTS defectively designed the platform and DEFENDANTS failed to test as to the safety of features they developed and

implemented for use in the platform. Once DEFENDANTS did perform some product testing and had knowledge of ongoing harm to Plaintiff, they failed to adequately remedy the product defects or warn Plaintiff.

77.     Instagram does not perform as safely as a reasonable and ordinary consumer would reasonably assume and reasonably expect. Instagram poses a risk of serious mental and physical health injuries as listed above.

78.     The risks inherent in the design of Instagram significantly outweigh any benefits of such design.

79.     DEFENDANTS could have utilized cost effective, reasonably feasible alternative designs to minimize these harms, such as by designing the product without the harm causing features listed above, that were less addictive, less likely to cause mental health harms, while still providing an optimal social media experience and facilitating social connection.

80.     DEFENDANTS could have limited the duration of login sessions to prevent harmful, extended use of the platform and could have designed the platform to logout for a period of time if excessive use occurred. It is well established in research that to effectively stay connected socially, a person only needs a limited amount of use time.   Instead, DEFENDANTS designed a product that uses behavioral engineering to maximize the number of use sessions and length of use per session, resulting in serious harm to Plaintiff.

81.     DEFENDANTS could have used technology to enable user-level access restrictions so that use was tied to a user's age verification, restricting those underaged from using the platform, or other youth protecting features.

82.    DEFENDANTS could have utilized cost effective, reasonably feasible alternative designs to minimize these harms, including, but not limited to:

a.   Designing a platform that did not include the features listed above while still fulfilling the social, interest, and business networking purposes of a social media platform;

b.   Default protective limits to length of use, frequency of use, or content types;

c.   Opt-in restrictions to length of use, frequency of use, or content types;

d.   Session time limits;

e.   Blocks to use during certain times of day (such as morning, during work or school periods, or during evenings);

f.   Session time notifications, warnings, or reports;

g.   Warning of health effects of use and extended use upon sign-up;

h.   Parental controls;

i.   Notification to parents regarding their child's extensive use, use during sleep hours, or exposure to harmful content on the platform,

j.   Self-limiting tools;

k.   Implementing labels on images and videos that have been edited through the platform;

l.   Age-based content filtering;

m.   General content filtering;

31

n. Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content (*e.g.*, content that causes negative social comparison and misleading lack of realism) such as in the genres of lifestyle, influencer, beauty, fitness, success flaunting, and/or heavily edited images and videos;

o. Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content, such as inappropriate or salacious content;

p. Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content such as controversial, political, or emotionally weighted content;

q. Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content such as content encouraging or promoting eating disorders, depressive thinking, self-harm, or suicide;

r. Informational labelling about the misleading and unrealistic nature of the content on a user's feed and the resulting feed composite because of content editing and algorithmic recommendation, presentation, and sorting;

s. Chronological presentation of content rather than algorithmic; and

t. Many other less harmful alternatives.

83. Instead, DEFENDANTS designed a platform that aggressively addict users with algorithms and features that increase addictiveness, use time, frequency

of use, attention stealing, engagement with the platform, mental health harms, and profit to Meta, all to the detriment of users' wellbeing.

84.     It is reasonable for parents to expect that social media products that actively promote their platform to children and adolescents will undertake reasonable efforts to notify parents when their child's use becomes excessive, occurs during sleep time, or exposes the child to harmful content. Defendants could feasibly design the product to identify adolescent users who are using the product excessively, using it during sleeping hours, or being exposed to harmful content, and notify their parents, at negligible cost.

85.     Engagement-based ranking and intermittent variable rewards are highly addictive, promote harmful social comparison, encourage bullying and conflict, can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful and present a false reality. Image and video filters inflict unrealistic and biased beauty standards upon users and cause harmful social comparison based on a misleading curation of peers' appearances, especially among teenage female users.

86.     The collaboration of these features multiplies the platform's power to inflict harm by heightening the platform's addictive nature, increasing exposure to content that triggers negative social comparison, exposing users to innately harmful content, increasing time of exposure to harm, further encouraging bullying, and promoting conflict, and multiplying harm in other ways.

87.     The features combine to create a user interface of endless, auto-playing, image, and video content, that is algorithmically sorted to place the most

attention-grabbing content at the top and/or in a distilled feed that is very difficult to cease consuming, especially for young users. Content that is promoted by the algorithm is often related to beauty, success/wealth flaunting, or lifestyles, which causes negative physical or social comparison, especially among teens. Meta's algorithms also promote controversial, disturbing, negative, and/or emotionally charged content causing harm to users.

88.    The combined result of these features is to present to users a false reality—it presents to users a world which is constantly controversial and negative; where most other people are exceedingly more attractive than the user, where most other people are exceedingly more successful and/or competent than the user; and which will facilitate and encourage harmful behaviors such as self-harm and eating disorders.

89.    These features take advantage of biological systems, human behavior, and psychology, to addict and condition users to engage in repetitive content-consuming actions such as scrolling, "liking," and sharing content in search of repeated dopamine releases. All the while, the users' input and behavior are tracked to allow the platform to automatically tune itself to each individual user to become as addictive and difficult to stop engaging with as possible.

90.    DEFENDANTS failed to design the product with adequate warnings about the likely harms of use.

91.    Plaintiff used Instagram as intended or in reasonably foreseeable ways. DEFENDANTS specifically intended for children and adolescents to use its product and were aware that children and adolescents were doing so.

92.     Plaintiff's injuries—physical, emotional, and economic—were reasonably foreseeable to DEFENDANTS at the time of the product's design, marketing, and operation.

93.     Instagram was defective and unreasonably dangerous when they left DEFENDANTS' sole possession/control and were offered to users. The defects continued to exist through use by consumers, including Plaintiff, who used the product without any substantial change in the product's condition.

94.     Plaintiff was injured as a direct and proximate result of the platform's defective design as described herein. The defective design of Instagram was a proximate cause of Plaintiff's harms.

95.     Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the social media induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## SECOND CAUSE OF ACTION
## STRICT LIABILITY - FAILURE TO WARN

96.     Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

97.     Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

98.     At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and or benefited from platform that Plaintiff used.

99.     Instagram  was and is in a defective condition that is unreasonably dangerous and unsafe to the consumer by failing to adequately warn users about the risk that the platform pose of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects, as described herein.

100.    DEFENDANTS were aware that Instagram posed, among other things, the above-stated risks considering scientific and medical knowledge that was generally accepted at the time of design, development, coding, dissemination, public release, and operation of its platform.

101.    Instagram is defective because, among other reasons described herein, DEFENDANTS failed to warn consumers, including Plaintiff, in the platform's, notices and through the marketing, promotion and advertising of the platform that, according to DEFENDANTS own research:

a.   At least five-to-six percent of fourteen-year-olds admit to addiction to the platform; and

b.   Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparison on Instagram

c.   Thirteen- and-one-half percent of teen-girl Instagram users say the platform makes thoughts of suicide and self-injury worse; and

    d. Instagram users are twice as likely to develop an eating disorder as those who do not use social media

102. Instagram is also defective for failing to warn users that:

    a. Engagement-based ranking and intermittent variable rewards are

        i. highly addictive,

        ii. promote harmful social comparison,

        iii. promote negative, controversial, and/or emotionally activating content, promote negative, harmful, and/or dangerous interest groups and/or content creators,

        iv. encourage bullying and conflict,

        v. can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm,

        vi. present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs);

    b. Face tracking and augmentation (image and video filters)

        i. inflict unrealistic and biased beauty standards upon users,

        ii. cause harmful social comparison based on a misleading curation of peers' appearances and success, especially among teenage female users;

    c. The platform causes the mental and physical health harms as listed above;

    d. The likelihood of these harms and likely severity for these harms are even greater for the developing brains of children and adolescents;

    e. The likelihood and intensity of these harmful effects are exacerbated by the interaction of these features; and

    f. The likelihood and intensity of these harmful effects are increased by other features and innerworkings of the platform which are currently publicly unknown and hidden from users and governments.

103. Through their incredible power as the premier social media company (and/or association with that company), DEFENDANTS have silenced and suppressed information, research efforts, and public awareness efforts regarding the harmful heath impact of their platform.

104. Rather than warning users of likely harms, DEFENDANTS regularly fine-tune the platform to aggressively psychologically engineer new and ongoing users to increase addiction and exposure to the platform, causing and increasing other mental and physical harms. The platform encourages users to recruit more users across their personal contacts.

105. The failure of DEFENDANTS to adequately warn about their defective product and choice to instead misleadingly advertise through conventional, online, and peer-to-peer avenues created a danger of injuries described herein that were reasonably foreseeable at the time of design, distribution, dissemination, and operation of the platform.

106.    Ordinary consumers would not have recognized the potential risks of Instagram when used in a manner reasonably foreseeable to DEFENDANTS.

107.    DEFENDANTS are strictly liable for creating, operating, and unleashing on users a defective platform that contained inadequate warnings.

108.    Plaintiff could not have averted injury through the exercise of reasonable care for reasons including DEFENDANTS' concealment of the true risks posed by Instagram.

109.    The defects in Instagram, including the lack of adequate warnings and instructions, existed at the time the product left DEFENDANTS' sole possession and continued to exist through the product's dissemination to and use by consumers, including Plaintiff. Instagram was used without substantial change in their condition, by anyone other than Defendants and its employees, from the time of their development.

110.    At all relevant times, DEFENDANTS could have provided adequate warnings and instructions to prevent the harms and injuries set forth herein, such as providing full and accurate information about the product in advertising, at point of sign-up, and at various intervals of the user interface.

111.    Plaintiff was injured as a direct and proximate result of DEFENDANTS' failure to warn and instruct because she would not have used or signed up on Instagram had she received adequate warnings and instructions that she could be harmed by platform design that hijacks a user's neural reward system, develop an addiction, be exposed to an algorithmic content feed causing negative social and appearance comparison and a negative false presentation of reality, and

suffer injuries including anxiety, attempted suicide, attempted self-harm, self-harm, and body dysmorphia.

112.    The only content on the website that has a semblance of a warning for the issues listed above is a link to a "Family Digital Wellness Guide" created by the Boston Children's Hospital Digital Wellness Lab. Buried in this guide is a mention that screens should not be used an hour before bed, because "[u]sing screens before bedtime or naptime can excite kids and keep them from falling asleep. The 'blue light' that comes from TVs and other screen devices can disrupt your child's natural sleep cycle, making it harder for them to fall asleep and wake up naturally. . . . [Late screen use can] result [ ] in your child getting less sleep and struggling to wake up on time. On average, school-age children need 9-12 hrs of sleep each night."

113.    The "Family Digital Wellness Guide" only alludes to the platform's manipulation, addictiveness, behavioral control, and data tracking of users: "Advertisers target children with lots of commercials, everything from sneakers and toys to unhealthy foods and snacks high in fat, sugar, and calories. Your children may also start becoming familiar with online influencers, who are also often paid to advertise a different product and services on social media. Helping your child think critically about how advertising tries to change behaviors, helps your child understand the purpose of ads, and empowers them to make informed decisions." The guide also briefly discusses cyber bullying.

114.    Finally, the guide mentions the body image harms social media inflicts, but it sole blames influencers as the cause rather than the platform's algorithms and features and asserts that the burden to remedy the issue is on parents,

rather than social media companies. "Science says: Tweens are often exposed to a lot of information online and through other media, both true and false, about how bodies 'should' look and what they can do to 'improve' their appearance. Certain body types are often idolized, when in reality bodies are incredibly diverse. There are many online accounts, websites, and influencers that make youth feel inadequate by encouraging them to lose weight or build up muscle, harming both their mental and physical health. . . . Protip: Actively listen and show that you care about how your child is feeling about puberty and how their body is changing. Talk with them about images on social and other media as these often set unrealistic ideals and help them understand that these images are often digitally altered or filtered so that people look more 'beautiful' than they really are." No similar warning is offered to young users in Meta's advertisements, at signup, or anywhere on the platform. Instead, Meta unreasonably and defectively leaves it to individuals' research ability for a user to be informed about the key dangers of their platforms.

115.   This informational report is from a third party, not Meta. Meta merely links to this information on a "Youth Portal" website in a location that is difficult and time-consuming to find. The is guide devoid of any mention of strong role that Instagram's individual or collective algorithm(s) and features play in each of these harms. Furthermore, it is uncertain how long even this limited information has been tethered by Meta.

116.   On another Meta created website that proposes to "help children and young people become empowered in a digital world," its "Wellness" subpage lists five activities, "mindful breathing," "finding support," "building resilience: finding

silver linings," "a moment for me," and "taking a break."[10] Nowhere does the website mention the mental health risks posed by Instagram as a result of the product features listed above.

117.    The platform's lack of adequate and sufficient warnings and instructions, and its inadequate and misleading advertising, was the proximate cause and/or a substantial contributing factor in causing the harm to Plaintiff.

118.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platform induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## THIRD CAUSE OF ACTION
## STRICT LIABILITY - MANUFACTURING DEFECT

119.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

120.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this cause of action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

121.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and or benefited from platform that Plaintiff used.

---

[10] https://www.facebook.com/fbgetdigital/youth/wellness

122.    DEFENDANTS actively controlled the Instagram platform during the entire period Plaintiff used them, as DEFENDANTS expected.

123.    Plaintiff used Instagram while they were actively controlled by DEFENDANTS and any changes or modifications to the conditions of this platform were foreseeable by these Defendants.

124.    Plaintiff used Instagram in a manner intended and/or foreseeable to DEFENDANTS.

125.    Instagram contained manufacturing defects as developed by DEFENDANTS and as placed in the stream of commerce in that the product deviated from component specifications and design, posed a risk of serious injury or death, and failed to perform as safely as the intended design would have performed.

126.    Without limitation, examples of DEFENDANTS' inadequate development, management, operation, maintenance, testing, and inspecting include:

    a. Failure to follow Good Manufacturing Practices ("GMPs");

    b. Failure to inspect and test the computer programming underlying the platform and features for errors, unintended output, or unintended executed results of a nature that could cause users harm;

    c. Failure to adequately inspect/test Instagram during the development process;

d.  Failure to test the mental and physical health impacts of its platform and product features, especially in regards to children and adolescents;

e.  Failure to implement procedures that would measure and confirm the behavioral and mental health impact of the platform;

f.  Failure to timely establish procedures or practices to prevent Instagram from having unintended mental and physical health consequences;

g.  Failure to test and research the actual user health impact cause by the *interaction* of the algorithm and other harm causing features listed above;

h.  Failure to test the platform's output to users given various user inputs;

i.  Failure to adequately test the user health result of specific computer coding and programs that constitute the platform and its features.

127.  Plaintiff was injured as a direct and proximate result of the developmental, inspection, coding, programming, testing, monitoring, and operational defects of Instagram as described herein.

128.  The defective development, inspection, coding, programming, testing, monitoring, and operation of Instagram was a proximate cause of Plaintiff's harms.

129. Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platform induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## FOURTH CAUSE OF ACTION
## PRODUCTS LIABILITY - NEGLIGENT DESIGN

130. Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

131. Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

132. At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and or benefited from platform that Plaintiff used.

133. Instagram was designed and intended to be used as a social media platform.

134. DEFENDANTS knew or, by the exercise of reasonable care, should have known use of Instagram was dangerous, harmful, and injurious when used by Plaintiff in a reasonably foreseeable manner, particularly so with children, adolescents and young adults.

135.   DEFENDANTS knew or, by the exercise of reasonable care, should have known ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of Instagram. Instagram is highly addictive and likely to cause mental and physical injuries as listed above.

136.   DEFENDANTS owed a duty to all reasonably foreseeable users to design a safe product.

137.   DEFENDANTS breached their duty by failing to use reasonable care in the design of Instagram because the product was addictive; had mental, cognitive, and physical health impacts; and had a likelihood of causing social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

138.   DEFENDANTS breached their duty by failing to use reasonable care in the design of Instagram by negligently designing the platform with physically and mentally harmful features including, but not limited to: (1) engagement-based ranking (sorting content on a user's feed based on engagement or "meaningful social interactions" rather than chronology); (2) intermittent variable rewards (a system of "likes", comments, strategically-timed notifications, promoting the content of new users and users who have not posted in a while, among other features); (3) face tracking and augmentation (i.e., photo and video filters designed to make users appear more attractive); (4) endless scrollable content (especially auto-playing video content such as the Instagram "Reels" content feed); (5) the

interaction of these features; and (6) other features of the platform which are currently unknown and hidden from users and governments.

139. Engagement-based ranking and intermittent variable rewards are highly addictive, promote harmful social comparison, encourage bullying and conflict, can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, and present a false reality. Image and video filters inflict unrealistic and biased beauty standards upon users and cause harmful social comparison based on a misleading curation of peers' appearances, especially among teenage female users.

140. The collaboration of these features multiplies the platform's power to inflict harm by heightening the platform's addictive nature, increasing exposure to content that triggers negative social comparison, exposing users to innately harmful content, increasing time of exposure to harm, further encouraging bullying and promoting conflict, and multiplying harm in other ways.

141. The features combine to create a user interface of endless, auto-playing image and video content, that is algorithmically sorted to place the most attention-grabbing content at the top and/or in a distilled feed that is very difficult to cease consuming, especially for young users. Content that is promoted by the algorithm is often related to beauty, success/wealth flaunting, or lifestyles, which causes negative physical or social comparison, especially among teens. Meta's algorithms also promote controversial, disturbing, negative, and/or emotionally charged content causing harm to users.

142.    The combined result of these features is to present to users a false reality—it presents to users a world which is constantly controversial and negative; where most other people are exceedingly more attractive than the user; where most other people are exceedingly more successful and/or competent than the user; and which will facilitate and encourage harmful behaviors such as self-harm and eating disorders.

143.    These features take advantage of biological systems, human behavior, and psychology, to addict and condition users to engage in repetitive, content-consuming actions such as scrolling, "liking," and sharing content in search of repeated dopamine releases. All the while, the users' input and behavior are tracked to allow the platform to automatically tune itself to each individual user to become as addictive and difficult to stop engaging with as possible.

144.    Potential health harms from these features include, among other types of harm, social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

145.    DEFENDANTS breached their duty by failing to use reasonable care in the design of Instagram by negligently designing Instagram to specifically appeal to children and adolescents, who were particularly unable to appreciate the risks posed by the platforms.

146.    DEFENDANTS breached their duty by failing to use reasonable care by failing to use cost effective, reasonably feasible alternative designs that would make the product less addictive and harmful to children and adolescents.

147.    DEFENDANTS breached their duty by failing to use reasonable care by failing to use cost effective, reasonably feasible alternative designs to minimize these harms, including but not limited to:

    a.  Designing a platform that did not include the features listed above while still fulfilling the social, interest, and business networking purposes of a social media platform;

    b.  Default protective limits to length of use, frequency of use, or content types;

    c.  Opt-in restrictions to length of use, frequency of use, or content types;

    d.  session time limits;

    e.  Blocks to use during certain times of day (such as morning, during work or school periods, or during evenings);

    f.  Session time notifications, warnings, or reports;

    g.  Warning of health effects of use and extended use upon sign-up;

    h.  Parental controls;

    i.  Self-limiting tools;

    j.  Implementing labels on images and videos that have been edited through the platform;

    k.  Age-based content filtering;

    l.  General content filtering;

m. Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content (by causing negative social comparison and misleading lack of realism) such as in the genres of lifestyle, influencer, beauty, fitness, success flaunting, and/or heavily edited images and videos;

n. Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content such as inappropriate or salacious content;

o. Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content such as controversial, political, or emotionally weighted content;

p. Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content such as content encouraging or promoting eating disorders, depressive thinking, self-harm, or suicide;

q. Informational labelling about the misleading and unrealistic nature of the content on a user's feed and the resulting feed composite because of content editing and algorithmic presentation/sorting;

r. Chronological presentation of content rather than algorithmic;

s. Many other less harmful alternatives.

148.    DEFENDANTS breached their duty by failing to use reasonable care by failing to use cost effective, reasonably feasible alternative designs that could have reduced mental and physical harms to users, especially youth. Instead, DEFENDANTS designed a platform that aggressively addict users with algorithms and features that increase addictiveness, use time, frequency of use, attention stealing, engagement with the platform, mental health harms, and profit to Meta, all to the detriment of users' wellbeing.

149.    DEFENDANTS breached their duty by failing to use reasonable care by failing to use cost-effective, reasonably feasible alternative designs utilizing technology to enable user-level access restrictions so that use was tied to a user's age verification, restricting those underaged from using the platform, or other youth-protecting features.

150.    A reasonable company under the same or similar circumstances would have designed a safer product.

151.    Plaintiff was harmed directly and proximately by DEFENDANTS' failure to use reasonable care in the design of Instagram. Such harm includes anxiety, attempted suicide, attempted self-harm, self-harm, and body dysmorphia, among other harmful effects.

152.    The design of Instagram was a proximate cause of Plaintiff's harms.

153.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platform induced injuries at an earlier date to allow for timely treatment and

prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## FIFTH CAUSE OF ACTION
## PRODUCTS LIABIITY - NEGLIGENT FAILURE TO WARN

154.   Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

155.   Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

156.   At all relevant times, the DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and or benefited from platform that Plaintiff used.

157.   The DEFENDANTS knew or, by the exercise of reasonable care, should have known use of Instagram was dangerous, harmful, and injurious when used by Plaintiff in a reasonably foreseeable manner, particularly with children, adolescents and young adults.

158.   The DEFENDANTS knew or, by the exercise of reasonable care, should have known ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of Instagram. Instagram is highly addictive and likely to cause mental and physical injuries as listed above.

159.   The DEFENDANTS knew or, by the exercise of reasonable care, should have known that Instagram posed risks, including the risks of social media

addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects, as described herein, that were known and knowable in light of scientific and medical knowledge that was generally accepted in the scientific community at the time of development, dissemination, public release, and operation of the platform.

160.   The DEFENDANTS owed a duty to all reasonably foreseeable users to disclose the risks associated with the use of Instagram.

161.   The DEFENDANTS breached their duty of care by failing to use reasonable care in providing adequate warnings in the platform's sign-up warnings, and through marketing, promoting and advertising of the platform including that, according to its own research:

a.   At least five-to-six percent of fourteen-year-olds admit to addiction to the platform; and

b.   Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram;

c.   Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of suicide and self-injury worse

d.   Seventeen percent of teen-girl Instagram users say the platform makes eating issues worse;

e.   Instagram users are twice as likely to develop an eating disorder as those who don't use social media.

162. Instagram is also defective for failing to warn users that:

    a. Engagement-based ranking and intermittent variable rewards are

        i. highly addictive,

        ii. promote harmful social comparison,

        iii. promote negative, controversial, and/or emotionally activating content, promote negative, harmful, and/or dangerous interest groups and/or content creators,

        iv. encourage bullying and conflict,

        v. can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm,

        vi. present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs);

    b. Face tracking and augmentation (image and video filters)

        j. inflict unrealistic and biased beauty standards upon users,

        iii. cause harmful social comparison based on a misleading curation of peers' appearances and success, especially among teenage female users;

    c. The platform causes the mental and physical health harms as listed above;

    d.  The likelihood of these harms and likely severity for these harms are even greater for the developing brains of children and adolescents;

    e.  The likelihood and intensity of these harmful effects are exacerbated by the interaction of these features; and

    f.  The likelihood and intensity of these harmful effects are increased by other features and innerworkings of the platform which are currently publicly unknown and hidden from users and governments.

163.   The failure of DEFENDANTS to adequately warn about its defective product, and its efforts to misleadingly advertise through conventional and social media avenues, created a danger of injuries described herein that were reasonably foreseeable at the time of design, development, coding, operation, and dissemination of the platform.

164.   Through their incredible power as the premier social media company (and/or association with that company), DEFENDANTS have silenced and suppressed information, research efforts, and public awareness efforts regarding the harmful heath impact of their platform.

165.   Rather than warning users of likely harms, DEFENDANTS regularly fine-tune the platform to aggressively socially and psychologically engineer new and ongoing users to increase addiction and exposure to a platform, causing and increasing physical and psychological harm. The platform encourages users to recruit more users across their personal electronic contacts.

166.    The failure of DEFENDANTS to adequately warn about its defective product— and its efforts to misleadingly advertise through conventional, online, and peer-to-peer avenues— created a danger of injuries described herein that were reasonably foreseeable at the time of design, distribution, and operation of the platform.

167.    At all relevant times, DEFENDANTS could have provided adequate warnings and instructions to prevent the harms and injuries set forth herein, such as providing full and accurate information about the product in advertising, at point of dissemination/account registration, and at various intervals of the user interface.

168.    A reasonable company under the same or similar circumstances would have warned and instructed of the dangers.

169.    Plaintiff was injured as a direct and proximate result of DEFENDANTS' failure to warn and instruct because she would not have used Instagram had she received adequate warnings and instructions that the platform could cause social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

170.    Meta's lack of adequate and sufficient warnings and instructions, and its inadequate and misleading advertising, was a substantial contributing factor in causing the harm to Plaintiff.

171.   Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platform induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## SIXTH CAUSE OF ACTION
## <u>PRODUCTS LIABILITY – NEGLIGENT MANUFACTURING</u>

172.   Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

173.   Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

174.   At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and or benefited from platform that Plaintiff used.

175.   DEFENDANTS had a duty to use exercise reasonable care, in the development, coding, operation, maintained, inspecting, testing, and dissemination of Instagram.

176.   DEFENDANTS knew or, by the exercise of reasonable care, should have known use of Instagram carelessly developed, coded, operated, maintained, inspected, tested, and disseminated was dangerous, harmful and injurious when used by Plaintiff in a reasonably foreseeable manner.

177.    DEFENDANTS knew or, by the exercise of reasonable care, should have known ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of Instagram improperly developed, coded, operated, maintained, inspected, tested, and disseminated.

178.    Without limitation, examples of DEFENDANTS' breaching their duty to exercise reasonable care in development, management, maintenance, testing, and inspecting include:

a.  Failure to follow Good Manufacturing Practices ("GMPs");

b.  Failure to inspect and test the computer programming underlying the platform and features for errors, unintended output, or unintended executed results of a nature that could cause users harm;

c.  Failure to adequately inspect/test Instagram during the development process;

d.  Failure to test the mental and physical health impacts of their platform and product features, especially in regards to children and adolescents;

e.  Failure to implement procedures that would measure and confirm the behavioral and mental health impact of the platform;

f.  Failure to timely establish procedures or practices to prevent Instagram from having unintended mental and physical health consequences.

g.  Failure to test and research the actual user health impact cause by the *interaction* of the algorithm and other harm causing features listed above;

h.  Failure to test the platform's output to users given various user inputs;

i.  Failure to adequately test the user health result of specific computer coding and programs that constitute the platform and their features.

179.  A reasonable manufacturer under the same or similar circumstances would have implemented appropriate manufacturing procedures to better ensure the quality of their product.

180.  Plaintiff was injured as a direct and proximate result of DEFENDANTS' failure to use reasonable care in the development, coding, operation, maintenance, inspection, testing, and dissemination.

181.  DEFENDANTS negligent development, coding, operation, maintenance, inspection, testing, and dissemination of Instagram was a substantial factor in causing Plaintiff's harms.

182.  Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platform induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

**SEVENTH CAUSE OF ACTION**

## NEGLIGENCE AND/OR GROSS NEGLIGENCE

183.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

184.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

185.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

186.    Instagram was the type of product that could endanger others if negligently made or promoted.

187.    DEFENDANTS had a duty of reasonable care in designing, manufacturing, coding, inspecting, testing, marketing, advertising, promoting, supplying, disseminating and/or making publicly available the platform to avoid causing harm to those that used Instagram.

188.    DEFENDANTS knew or should have known by the exercise of reasonable care, the risks to users of the platform, of mental and physical health harms.

189.    DEFENDANTS knew or should have known by the exercise of reasonable care, that children, adolescents and children and young people would be attracted to this product.

190.    DEFENDANTS knew or, by the exercise of reasonable care, should have known use of Instagram was dangerous, harmful, and injurious when used by Plaintiff in a reasonably foreseeable manner, particularly with children, adolescents and young adults.

191.    DEFENDANTS knew or, by the exercise of reasonable care, should have known ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of Instagram. Instagram is highly addictive and likely to cause mental and physical injuries as listed above.

192.    DEFENDANTS knew or, by the exercise of reasonable care, should have known that Instagram posed risks including the risks of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects, as described herein, that were known and knowable in light of scientific and medical knowledge that was generally accepted in the scientific community at the time of development, dissemination, public release, and operation of the platform.

193.    DEFENDANTS knew or should have known that Instagram needed to be researched, designed, manufactured, coded, programmed, assembled, inspected, tested, marketed, advertised, promoted, operated, managed, maintained, supplied, disseminated, and/or made available properly, without defects and with due care to avoid needlessly causing harm.

194.    DEFENDANTS knew or should have known that Instagram would cause harm to users if the following features, among others, were included: (1) engagement-based ranking (sorting content on a user's feed based on engagement or "meaningful social interactions" rather than chronology); (2) intermittent variable rewards (a system of "likes", comments, strategically timed notifications, promoting the content of new users and users who have not posted in a while, among other features); (3) face tracking and augmentation (i.e., photo and video filters designed to make users appear more attractive); (4) endless scrollable content (especially auto-playing video content such as the Instagram "Reels" content feed); (5) the interaction of these features; and (6) other features of the platform which are currently unknown and hidden from users and governments.

195.    DEFENDANTS knew or should have known that engagement-based ranking and intermittent variable rewards are highly addictive, promote harmful social comparison, encourage bullying and conflict, can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, and present a false reality. Image and video filters inflict unrealistic and biased beauty standards upon users and cause harmful social comparison based on a misleading curation of peers' appearances, especially among teenage female users.

196.    DEFENDANTS knew or should have known that the collaboration of these features multiplies the platform's power to inflict harm by heightening the platform's addictive nature, increasing exposure to content that triggers negative social comparison, exposing users to innately harmful content, increasing time of

exposure to harm, further encouraging bullying and promoting conflict, and multiplying harm in other ways.

197.    DEFENDANTS knew or should have known that the features combine to create a user interface of endless, auto-playing, image and video content, that is algorithmically sorted to place the most attention-grabbing content at the top and/or in a distilled feed that is very difficult to cease consuming, especially for young users. Content that is promoted by the algorithm is often related to beauty, success/wealth flaunting, or lifestyles, which causes negative physical or social comparison, especially among teens. Meta's algorithms also promote controversial, disturbing, negative, and/or emotionally charged content causing harm to users.

198.    DEFENDANTS knew or should have known that the combined result of these features is to present to users a false reality—it presents to users a world which is constantly controversial and negative; where most other people are exceedingly more attractive than the user; where most other people are exceedingly more successful and/or competent than the user; and which will facilitate and encourage harmful behaviors such as self-harm and eating disorders.

199.    DEFENDANTS knew or should have known that these features take advantage of biological systems, human behavior, and psychology, to addict and condition users to engage in repetitive content-consuming actions such as scrolling, "liking," and sharing content in search of repeated dopamine releases. All the while, the users' input and behavior are tracked to allow the platform to automatically tune itself to each individual user to become as addictive and difficult to stop engaging with as possible.

200.    DEFENDANTS knew or should have known that  Instagram could cause serious risk of harm, particularly to young persons, children, and adolescents.

201.    DEFENDANTS were negligent, reckless, and careless and failed to take the care and duty owed to Plaintiff, thereby causing Plaintiff to suffer harm.

202.    The negligence and extreme carelessness of DEFENDANTS includes, but is not limited to, the following:

a.   Failure to perform adequate testing of the Instagram prior to marketing to ensure safety, including long-term testing of the product, and testing for physical and mental health injuries;

b.   Failure to warn consumers that Instagram had not been adequately tested or researched prior to marketing to ensure safety;

c.   Failure to take reasonable care in the design of Instagram;

d.   Failure to use reasonable care in the production/development of Instagram;

e.   Failure to use reasonable care in the operation of Instagram;

f.   Failure to use reasonable care in the coding/assembly of Instagram;

g.   Failure to use reasonable care in advertising, promoting, and marketing Instagram;

h.   Failure to use reasonable care in the dissemination of  Instagram without adequate warnings;

i.  Use of a design that includes features that cause mental and physical harm, including, but not limited to: (1) engagement-based ranking (sorting content on a user's feed based on engagement or "meaningful social interactions" rather than chronology); (2) intermittent variable rewards (a system of "likes," comments, strategically-timed notifications, promoting the content of new users and users who have not posted in a while, among other features); (3) face tracking and augmentation (*i.e.*, photo and video filters designed to make users appear more attractive); (4) endless scrollable content (especially auto-playing video content such as the Instagram "Reels" content feed); (5) the interaction of these features; and (6) other features of the platform which are currently unknown and hidden from users and governments;

j.  Use of a design, engagement-based ranking and intermittent variable rewards that DEFENDANTS knew or should have known that are highly addictive, promote harmful social comparison, encourage bullying and conflict, can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, and present a false reality. Image and video filters inflict unrealistic and biased beauty standards upon users and cause harmful social

65

comparison based on a misleading curation of peers' appearances, especially among teenage female users;

k.  Use of design features that DEFENDANTS knew or should have known would interact to multiply the platform's power to inflict harm by heightening the platform's addictive nature, increasing exposure to content that triggers negative social comparison, exposing users to innately harmful content, increasing time of exposure to harm, further encouraging bullying and promoting conflict, and multiplying harm in other ways;

l.  Use of design features that DEFENDANTS knew or should have known would combine to create a user interface of endless, auto-playing, image and video content, that is algorithmically sorted to place the most attention-grabbing content at the top and/or in a distilled feed that is very difficult to cease consuming, especially for young users. Content that is promoted by the algorithm is often related to beauty, success/wealth flaunting, or lifestyles, which causes negative physical or social comparison, especially among teens. Meta's algorithms also promote controversial, disturbing, negative, and/or emotionally charged content causing harm to users;

m. Use of design features that DEFENDANTS knew or should have known would result in presenting to users a false reality—it presents to users a world which is constantly controversial and negative; most other people are exceedingly more attractive than the user, and most other people are more successful and/or competent than the user;

n. Failure to inspect Instagram for it to operate properly and avoid addiction, overuse, or mental health harms;

o. Failure to reasonably and properly test and properly analyze the testing of Instagram under reasonably foreseeable circumstances;

p. Failure to warn consumers about the dangers associated with use of Instagram, in that it was unsafe, causes social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects;

q. Failure to subsequently remedy harm-causing features of the platform after Meta had actual knowledge of harm to users;

67

r.   Failure to provide any instructions regarding a safe manner, frequency, and length of use of the platform per day;

s.   Failure of DEFENDANTS to verify the age of consumers creating accounts and using Instagram;

t.   Failure to recall Instagram;

u.   All other failures, acts and omissions set forth herein.

203.   DEFENDANTS' acts and omissions constitute gross negligence, because they constitute a total lack of care and an extreme departure from what a reasonably careful company would do in the same situation to prevent foreseeable harm to Plaintiff.

204.   DEFENDANTS acted and/or failed to act willfully, and with conscious and reckless disregard for the rights and interests of Plaintiff, and their acts and omissions had a great probability of causing significant harm and in fact resulted in such harm to Plaintiff.

205.   Based on their strategic and intentional promotion, advertising and marketing history, DEFENDANTS reasonably should have foreseen that children and young people would try Instagram and quickly become addicted to Instagram, resulting in teenagers and young adults developing lifelong addictions. After fine-tuning the product to addict users using features that also result in serious mental health and physical harms, DEFENDANTS reasonably should have foreseen the emotional distress this would cause on the individuals who would get addicted, as well the stress this would place on their loved ones around them.

206. Defendants intentionally created an attractive nuisance to children, but simultaneously failed to provide adequate warnings or safeguards from the harmful effects they knew were occurring.

207. Plaintiff was injured as a direct and proximate result of negligence and/or gross negligence as described herein. Such harm includes anxiety, attempted suicide, attempted self-harm, self-harm, and body dysmorphia, among other harmful effects, which may cause or contribute to additional disease.

208. DEFENDANTS' negligence and/or gross negligence were a substantial factor in causing and or contributing to Plaintiff's harms.

209. Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platform induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## EIGHTH CAUSE OF ACTION
## NEGLIGENT MISREPRESENTATION

210. Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

211. Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

212.   At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

213.   DEFENDANTS were negligent, reckless and careless and owed a duty to Plaintiff to make accurate and truthful representations regarding Instagram, DEFENDANTS breached their duty, thereby causing Plaintiff to suffer harm.

214.   DEFENDANTS represented to Plaintiff—via the media, advertising, website, social media, and promotions, among other misrepresentations described herein—that:

a.   Instagram was safe and were not harmful;

b.   Long-term, frequent, prolonged use was harmless;

c.   Instagram increased social connectivity, rather than causing feelings of isolation; and

d.   An inaccurate and misleading portrayal of the platform's mental and physical health impact;

215.   DEFENDANTS omitted/failed to ever inform Plaintiff and other consumers, by any media, that, according to its own research:

a.   At least five-to-six percent of fourteen-year-olds admit to addiction to the platform; and

b.   Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram

70

    c.  Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of suicide and self-injury worse.

    d.  Seventeen percent of teen-girl Instagram users say the platform makes eating issues worse and

    e.  Instagram users are twice as likely to develop an eating disorder as those who don't use social media.

216.  Meta also omitted to inform users that, as it knew or should have known:

    a.  Engagement-based ranking and intermittent variable rewards are

      i.  highly addictive,

     ii.  promote harmful social comparison

    iii.  promote negative, controversial, and/or emotionally activating content,

    iv.  promote negative, harmful, and/or dangerous interest groups and/or content creators,

     v.  encourage bullying and conflict,

    vi.  can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm, and

    vii.   present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs);

b.  Face tracking and augmentation (image and video filters):

    i.  inflict unrealistic and biased beauty standards upon users, and

    ii.  cause harmful social comparison based on a misleading curation of peers' appearances and success, especially among teenage female users;

c.  The platform causes the mental and physical health harms as listed above;

d.  The likelihood of these harms and likely severity for these harms are even greater for the developing brains of children and adolescents;

e.  The likelihood and intensity of these harmful effects are exacerbated by the interaction of these features; and

f.  The likelihood and intensity of these harmful effects are increased by other features and innerworkings of the platform which are currently publicly unknown and hidden from users and governments.

217.   These representations were false and omissions were material. The platform is unsafe and were known by Meta to cause mental and physical health harms, especially in youth, such as social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

218.   DEFENDANTS knew or should have known these representations were false and negligently made them without regard for their truth.

219.   Through DEFENDANTS' incredible power as the premier social media company (and/or association with that company), they have silenced and suppressed information, research efforts, and public awareness efforts regarding the harmful heath impact of their platform.

220.   DEFENDANTS had a duty to accurately provide this information to Plaintiff. In concealing this information from Plaintiff, DEFENDANTS breached their duty. DEFENDANTS also gained financially from this concealment, and because of their breach.

221.   DEFENDANTS intended for Plaintiff to rely on these representations.

222.   Each of these misrepresentations were material at the time they were made. Each of the misrepresentations concerned material facts that were essential to the analysis undertaken by Plaintiff as to whether to sign up for or use Instagram.

223.   DEFENDANTS have yet to disclose or correct these misrepresentations about Instagram.

224. Plaintiff reasonably relied on these representations and were harmed as described herein. Plaintiff's reliance on DEFENDANTS' representation was a substantial factor in causing Plaintiff's harms. Had DEFENDANTS told Plaintiff the truth about the safety and algorithmic framework of the platform, Plaintiff would not have registered with them or used them.

225. DEFENDANTS' acts and omissions as described herein were committed in reckless disregard of Plaintiff's rights, interests, and well-being to enrich DEFENDANTS.

226. Plaintiff was injured as a direct and proximate result of DEFENDANTS' negligent misrepresentations regarding Instagram as described herein. Such harm includes

anxiety, attempted suicide, attempted self-harm, self-harm, and body dysmorphia, among other harmful effects.

227. Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platform induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## NINTH CAUSE OF ACTION
## FRAUD

228. Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

229.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

230.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

231.    DEFENDANTS' marketing, promotions and advertisements contained deceptive and/or misleading statements, implications, images, and portrayals that the platform was safe, improved social connectivity, and improved the mental and physical health of its users. In actuality, Instagram pose a serious risk to users' mental and physical health, which Meta has long known.

232.    DEFENDANTS' marketing, promotions and advertisements failed to disclose that the platform, by contrast, were likely to cause social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harms.

233.    The omissions were misleading and deceptive standing alone and were particularly deceptive in light of Meta's marketing, promotions and advertising of Instagram as positive for users mental and physical health.

234.    DEFENDANTS represented to Plaintiff—via the media, internet, advertising, its website, the platform itself, other social media, and promotions—that:

    a.  Instagram was safe and were not harmful;

    b.  Instagram was positive and beneficial to a users' wellbeing, improved social connectivity, and improved the mental and physical health of its users;

    c.  Long-term, frequent, prolonged use was harmless;

    d.  Instagram increased social connectivity, rather than causing feelings of isolation;

    e.  An inaccurate and misleading portrayal of the platform mental and physical health impact; and

    f.  Other misrepresentations described herein.

235.    DEFENDANTS omitted/failed to ever inform Plaintiff and other consumers, by any media, that, according to its own research:

    a.  At least five-to-six percent of fourteen-year-olds admit to addiction to the platform; and

    b.  Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparison on Instagram;

    c.  Thirteen-and-one-half percent of teen-girl Instagram users say that platform makes thought of suicide and self-injury worse;

     d.  Seventeen percent of teen girls Instagram users say the platform makes eating issues worse; and

     e.  Instagram users ae twice as likely to develop and eating disorder as those who don't use social media.

236.   Meta also omitted/failed to inform users that, as it knew or should have known:

     a.  Engagement-based ranking and intermittent variable rewards are:

      i.   highly addictive,

      ii.   promote harmful social comparison,

      iii.   promote negative, controversial, and/or emotionally activating content,

      iv.   promote negative, harmful, and/or dangerous interest groups and/or content creators,

      v.   encourage bullying and conflict,

      vi.   can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm, and

      vii.   present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs);

    b. Face tracking and augmentation (image and video filters):

       i. inflict unrealistic and biased beauty standards upon users, and

      ii. cause harmful social comparison based on a misleading curation of peers' appearances and success, especially among teenage female users;

    c. The platform causes the mental and physical health harms as listed above;

    d. The likelihood of these harms and likely severity for these harms are even greater for the developing brains of children and adolescents;

    e. The likelihood and intensity of these harmful effects are exacerbated by the collaboration of these features; and

    f. The likelihood and intensity of these harmful effects are increased by other features and innerworkings of the platform which are currently publicly unknown and hidden from users and governments.

237.    These representations were false and material. These omissions also communicated falsehoods and were material. The platform is unsafe and were known by Meta to cause mental and physical health harms, especially in youth, such as social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD,

difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

238.    The above representations were communicated to Plaintiff.

239.    Through their incredible power as the premier social media company (and/or association with that company), DEFENDANTS have silenced and suppressed information, research efforts, and public awareness efforts regarding the harmful heath impact of their platform.

240.    DEFENDANTS' conduct was fraudulent and deceptive because their misrepresentations and omissions had the capacity to, were likely to, and, in fact, did deceive reasonable consumers including the Plaintiff. Reasonable consumers, including the Plaintiff, would have found it material to their purchasing decisions that the platform's product posed unreasonable risks of substantial mental and bodily injury, including addiction resulting from the use of the product. Knowledge of these facts would have been a substantial factor in Plaintiff's decisions to purchase and consume Instagram.

241.    DEFENDANTS owed Plaintiff a duty to disclose these facts because they were known and/or accessible exclusively to DEFENDANTS, who have had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because the platform poses an unreasonable risk of substantial mental and bodily injury; and because the platform made partial representations concerning the same subject matter as the omitted facts.

242.    Plaintiff reasonably and justifiably relied on the misrepresentations and/or omissions. Reasonable consumers would have been expected to have relied on the platform's misrepresentations and omissions.

243.   DEFENDANTS    knew    or    should    have    known    that    its misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

244.   DEFENDANTS'   misrepresentations   and/or   omissions   were   a substantial factor in causing Plaintiff's harms. Plaintiff was injured as a direct and proximate result of DEFENDANTS' fraudulent conduct as described herein.

245.   Plaintiff    demands    judgment    against    DEFENDANTS    for compensatory, treble, and punitive damages, medical monitoring to diagnose the platform induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## TENTH CAUSE OF ACTION
## FRAUDULENT CONCEALMENT

246.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

247.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

248.   At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

249.   DEFENDANTS had a duty to disclose material facts about Instagram to Plaintiff.

250.   DEFENDANTS fraudulently and deceptively marketed Instagram to Plaintiff as safe, healthful, or not harmful, and beneficial to user mental health and social connectedness when DEFENDANTS knew it to be untrue.

251.   DEFENDANTS fraudulently and deceptively downplayed or minimized any risk associated with its platform and product features. DEFENDANTS and others worked together to pitch news stories or other media content designed to downplay the risks of its platform, suggesting that any concern was overblown, or a panic. These tactics mimic those used by the tobacco industry to sow seeds of doubt and confusion among the public, to initiate new users, to keep customers using Instagram, and to avoid regulation or legislative efforts to control Meta.

252.   Through their incredible power as the premier social media company (and/or association with that company), DEFENDANTS have silenced and suppressed information, research efforts, and public awareness efforts regarding the harmful heath impact of their platform.

253.   DEFENDANTS fraudulently and deceptively concealed that Instagram can cause social media addiction, depression, body dysmorphia, anxiety,

suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harms.

254. DEFENDANTS fraudulently and deceptively concealed they had not adequately researched or tested the platform and its features to assess its safety before offering it on the market and promoting it to children and young people and adults.

255. DEFENDANTS fraudulently and deceptively concealed that the platform was powerfully addictive.

256. DEFENDANTS further failed to disclose to Plaintiff that the platform is designed to create and sustain an addiction. DEFENDANTS also manipulated the platform's algorithms and features in ways that could and would impact their addictiveness and mental health impact, and DEFENDANTS did so without notifying Plaintiff. DEFENDANTS actively concealed the innerworkings of its platform and their mental health impacts.

257. DEFENDANTS concealed from Plaintiff that, according to its own research:

a. At least five-to-six percent of fourteen-year-olds admit to addiction to the platform; and

b. Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram;

c. Thirteen-and-one-half percent of teen-girl Instagram users say they platform makes thoughts of suicide and self-injury worse;

d. Seventeen percent of teen-girl Instagram users say the platform makes eating issues worse; and

e. Instagram users are twice as likely to develop an eating disorder as those who don't use social media.

258. DEFENDANTS also concealed from Plaintiff that:

a. Engagement-based ranking and intermittent variable rewards are

    i. highly addictive,

    ii. promote harmful social comparison,

    iii. promote negative, controversial, and/or emotionally activating content, promote negative, harmful, and/or dangerous interest groups and/or content creators,

    iv. encourage bullying and conflict,

    v. can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm,

    vi. present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs);

b. Face tracking and augmentation (image and video filters)

    k. inflict unrealistic and biased beauty standards upon users,

      iv.   cause harmful social comparison based on a misleading curation of peers' appearances and success, especially among teenage female users;

c.  The platform causes the mental and physical health harms as listed above;

d.  The likelihood of these harms and likely severity for these harms are even greater for the developing brains of children and adolescents;

e.  The likelihood and intensity of these harmful effects are exacerbated by the interaction of these features; and

f.  The likelihood and intensity of these harmful effects are increased by other features and innerworkings of the platform which are currently publicly unknown and hidden from users and governments.

259.    Each of these misrepresentations and omissions were material at the time they were made. Each of the misrepresentations and omissions concerned material facts that were essential to the analysis undertaken by Plaintiff as to whether to register or use the platform.

260.    Plaintiff did not know of the facts that DEFENDANTS concealed.

261.    DEFENDANTS intended to deceive Plaintiff and the public by concealing these facts.

262.    DEFENDANTS had a duty to accurately provide this information to Plaintiff. In concealing this information from Plaintiff, DEFENDANTS breached

their duty. DEFENDANTS also gained financially from this concealment, and because of their breach.

263.   DEFENDANTS had ample opportunities to disclose these facts to Plaintiff, through advertising, on its websites, platform, and on other social media. DEFENDANTS concealed material information at all relevant times, through today. DEFENDANTS have yet to disclose the truth about Instagram.

264.   Plaintiff relied to her detriment on DEFENDANTS' fraudulent omissions. Had Plaintiff been adequately informed of the material facts concealed from her regarding the safety of the platforms, and not intentionally deceived by DEFENDANTS, she would not have signed up for or used Instagram.

265.   DEFENDANTS' fraudulent concealment was a substantial factor in Plaintiff's harms as described herein, including anxiety, attempted suicide, attempted self-harm, self-harm, and body dysmorphia, among other harmful effects, which may cause or contribute to additional disease.

266.   Plaintiff was injured as a direct and proximate result of DEFENDANTS' fraudulent conduct as described herein.

267.   Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platform induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

**ELEVENTH CAUSE OF ACTION**
**CONSPIRACY TO COMMIT FRAUD**

268.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

269.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability and conspiracy, statutes, and the common law of Plaintiff's respective State.

270.    DEFENDANTS entered into an agreement to advance their financial interests by injuring Plaintiff. Specifically, DEFENDANTS worked in concert to maintain and maximize the number of users addicted to Instagram to ensure a steady and growing customer base.

271.    DEFENDANTS sought to accomplish this objective by: (1) designing a product that was intended to addict its users to dopamine-triggering stimuli on its electronic platform (similar to electronic gambling platforms); (2) marketing, advertising, promoting and misbranding that platform to consumers, including the vulnerable youth market; and (3) defrauding regulators and the public to advance their interests.

272.    Plaintiff's addiction to the platform was a primary object of the Conspiracy. DEFENDANTS orchestrated efforts with a unity of purpose to addict this generation of teenagers and young adults to its platform by way of unlawful conduct in marketing, promoting, manufacturing, designing, and disseminating Instagram that substantially contributed to the Plaintiff's injuries as alleged herein.

273.   DEFENDANTS further conspired with one another by setting out to entice and lure new users of the platform as a wrongful, unlawful, and tortious means to make a profit.

274.   Plaintiff demands the applicable relief set forth in the Prayer for Relief below.

275.   DEFENDANTS' conspiracy involved:

  a.  Developing a social media platform to be as addictive as possible, regardless of mental and physical health impacts;

  b.  Suppressing internal and external efforts to research the harmful effects of this platform;

  c.  Suppressing internal and external efforts to inform consumers of the harmful effects of this platform;

  d.  Making knowingly false and misleading representations and omissions to government organizations, personnel, legislators, and regulators, including at congressional hearings; and

  e.  Engaging in lobbying efforts and political donations to discourage office holders from performing oversight of its platform.

276.   DEFENDANTS' conduct violated state law and constituted a conspiracy to harm Plaintiff. Plaintiff brings a cause of action for conspiracy to commit fraud under applicable state statutory and common law.

277.   DEFENDANTS' conspiracy to commit fraud was a substantial factor in causing Plaintiff's harms. Plaintiff was injured, as described herein, as a direct and proximate result of DEFENDANTS' unlawful conspiracy as described herein.

278.    Plaintiff demands judgment against Defendants for compensatory, treble, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## TWELFTH CAUSE OF ACTION
## UNJUST ENRICHMENT

279.    Plaintiff incorporates by reference each preceding and succeeding paragraph as although set forth fully at length herein.

280.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

281.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

282.    DEFENDANTS concealed from Plaintiff that, according to its own research:

a.    At least five-to-six percent of fourteen-year-olds admit to addiction to the platform; and

b.    Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons of Instagram;

c.    Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of suicide and self-injury worse;

d.  Seventeen percent of teen-girl Instagram users say that platform makes eating issues worse; and

e.  Instagram users are twice as likely to develop an eating disorder as those who don't use social media.

283.  DEFENDANTS also concealed from Plaintiff that:

a.  Engagement-based ranking and intermittent variable rewards are:

i.  highly addictive,

ii.  promote harmful social comparison,

iii.  promote negative, controversial, and/or emotionally activating content,

iv.  promote negative, harmful, and/or dangerous interest groups and/or content creators,

v.  encourage bullying and conflict,

vi.  can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm, and

vii.  present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs);

b.  Face tracking and augmentation (image and video filters):

i.   inflict unrealistic and biased beauty standards upon users, and

ii.  cause harmful social comparison based on a misleading curation of peers' appearances and success, especially among teenage female users;

c.   The platform causes the mental and physical health harms as listed above;

d.   The likelihood of these harms and likely severity for these harms are even greater for the developing brains of children and adolescents;

e.   The likelihood and intensity of these harmful effects are exacerbated by the collaboration of these features; and

f.   The likelihood and intensity of these harmful effects are increased by other features and innerworkings of the platform which are currently publicly unknown and hidden from users and governments.

284.   DEFENDANTS received a measurable benefit at the expense of Plaintiff in the form of ad revenue and other revenue derived from consumers use of Instagram.

285.   DEFENDANTS appreciated, recognized, and chose to accept the monetary benefits Plaintiff's registration and use of the platform conferred onto DEFENDANTS at the Plaintiff's detriment. These benefits were the expected result of DEFENDANTS acting in their pecuniary interests at the expense of its users.

286.    The harm causing features listed above were the same platform components that increased Meta's revenue—addiction and overuse of the platform directly creates increased ad revenue for the company. The benefit to Meta came directly at the expense of the Plaintiff's time, mental wellness, and physical health.

287.    There is no justification for DEFENDANTS' enrichment. It would be inequitable, unconscionable, and unjust for DEFENDANTS to be permitted to retain these benefits because the benefits were procured because of their wrongful conduct.

288.    DEFENDANTS wrongfully obfuscated the harm caused by their conduct. Thus, Plaintiff, who mistakenly enriched DEFENDANTS by relying on DEFENDANTS' fraudulent representations, could not and did not know the effect that using Instagram would have on Plaintiff's health.

289.    Plaintiff is entitled to restitution of the benefits DEFENDANTS unjustly retained and/or any amounts necessary to return Plaintiff to the position she occupied prior to dealing with DEFENDANTS. Due to the sprawling, decades-long concern about the impacts of technology and the internet on mental and physical health, and litigation commonly following injuries afflicted using the internet, and other notice they have received because of lawsuits filed against them, DEFENDANTS are reasonably notified that Plaintiff would expect compensation from DEFENDANTS' unjust enrichment stemming from their wrongful actions.

290.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platform induced injuries at an earlier date to allow for timely treatment and

prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## THIRTEENTH CAUSE OF ACTION
## VIOLATION OF UNFAIR TRADE PRACTICES/CONSUMER PROTECTION LAWS

291.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

292.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective States.

293.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

294.    Plaintiff herein brings a cause of action for consumer fraud and/or unfair and deceptive trade practices and/or unfair business practices under applicable state law.

295.    DEFENDANTS are on notice that such claims may be asserted by Plaintiff.

296.    Plaintiff registered for and used INSTAGRAM and suffered injuries because of DEFENDANTS' actions in violation of these consumer protection laws.

297.   Had DEFENDANTS not engaged in the deceptive conduct described herein, Plaintiff would not have registered for or used INSTAGRAM resulting in the injuries as alleged herein.

298.   Fraudulent, unfair, and/or deceptive practices that violate consumer protection laws include, but are not limited to, the following:

    a.   Representing that goods or services have approval, characteristics, uses, or benefits that they do not have;

    b.   Advertising goods or service with the intent not to sell them as advertised;

    c.   Engaging in fraudulent or deceptive conduct that creates a likelihood of confusion;

    d.   Engaging in fraudulent or deceptive conduct that causes actual confusion or misunderstanding as to the approval of certain goods; and

    e.   Many other fraudulent, unfair, and/or deceptive as stated elsewhere in this complaint.

299.   Plaintiff was injured by DEFENDANTS' unlawful conduct, which was furthered through a pervasive pattern of false and misleading statements and omissions by targeting children and adolescents and portraying Instagram as harmless and beneficial, while misrepresenting or omitting concerns about their mental and physical health impact, addictiveness, and safety.

300.    DEFENDANTS have a statutory duty to refrain from fraudulent, unfair, and deceptive acts or trade practices in the design, development, manufacture, promotion, and sale of their product. DEFENDANTS' deceptive, unconscionable, unfair and/or fraudulent representations and material omissions to Plaintiff constituted consumer fraud and/or unfair and deceptive acts and trade practices in violation of consumer protection statutes, including, but not limited to, the Michigan Consumer Protection Act, Mich. Comp. Laws §§ 445.901 *et seq*.

301.    Under these and other consumer protection statutes, DEFENDANTS are the suppliers, distributors, programmers, manufacturers (developers), advertisers, marketers, promoters and sellers (disseminators) of Instagram, who are subject to liability under such legislation for fraudulent, unfair, deceptive, and unconscionable consumer practices. The actions and omissions of DEFENDANTS are uncured or incurable and DEFENDANTS were aware of the same well in advance of this filing and failed to take any action to cure their actions or omissions.

302.    Plaintiff justifiably relied to their detriment on DEFENDANTS' misrepresentations and omissions in deciding to use Instagram.

303.    By reason of the fraudulent and unlawful acts engaged in by DEFENDANTS, and as a direct and proximate result thereof, Plaintiff has sustained economic losses and other damages and are entitled to statutory and compensatory damages in an amount to be proven at trial.

304.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platform induced injuries at an earlier date to allow for timely treatment and

prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## FOURTEENTH CAUSE OF ACTION
## BREACH OF EXPRESS WARRANTY

305.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

306.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

307.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

308.    DEFENDANTS violated state law for breach of express warranties and Plaintiff herein will bring a cause of action for breach of express warranty under applicable State common law.

309.    Upon information and belief, DEFENDANTS expressly warranted through public statements, press releases, advertisements, marketing materials, sign-up notices, clickwrap (and/or browsewrap or scrollwrap), and descriptions that the platform Instagram was safe for their intended use and that it was safe for youth to use.

310.   Upon information and belief, DEFENDANTS expressly warranted to consumers, like Plaintiff, through written or electronic statements, descriptions, and affirmations of fact on its websites, advertising, and marketing materials that Instagram would improve users' mental health, sense of community, and emotional connectedness with others.

311.   These affirmations of fact became the basis of the bargain between DEFENDANTS and Plaintiff, thereby creating express warranties that Instagram would conform to Meta's affirmations of fact, representations, promises, and descriptions.

312.   As described herein, the platform actually uses features that cause social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harms, which may cause or contribute to additional disease.

313.   These express communications contained misrepresentations and failed to warn of the serious and known risks of Instagram as alleged herein.

314.   When DEFENDANTS made these express warranties, they knew the intended purposes of Instagram and warranted the product to be, in all respects, safe and proper for such purposes.

315.   DEFENDANTS authored the documents and/or made the statements upon which these warranty claims were based and, in doing so, defined the terms of those warranties. The Instagram platform made available by DEFENDANTS did

not conform to DEFENDANTS' promises, descriptions or affirmations and were not adequately designed, developed, tested, promoted and/or fit for the ordinary purposes for which they were intended.

316.   All of the aforementioned written or electronic materials are known to DEFENDANTS and in their possession, and it is Plaintiff's belief that these materials shall be produced by DEFENDANTS and made part of the record once discovery is completed.

317.   DEFENDANTS' breach of these express warranties were a substantial factor in causing Plaintiff's harms.

318.   As a direct and proximate result of DEFENDANTS' breach of these warranties, Plaintiff suffered serious injuries and/or sequelae thereto as alleged herein.

319.   Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platform induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

**FIFTEENTH CAUSE OF ACTION**
**<u>BREACH OF AN IMPLIED WARRANTY OF MERCHANTABILITY</u>**

320.   Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

321.   Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including

the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

322. At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

323. DEFENDANTS at all times were merchants with respect to the Instagram platform provided to Plaintiff and were in the business of programming, developing, disseminating, and operating such a product.

324. Each platform Meta provided comes with an implied warranty that it will be merchantable and fit for the ordinary purpose for which it would be used.

325. The ordinary intended purposes of the platform—and the purpose for which they are marketed, promoted, and made available—is to serve as safe social media platform and allow users to connect with friends, create new and palatable association with strangers, and groups online.

326. The platform is not fit for that use—or any other use—because they pose significant risks of substantial mental and physical injury resulting from the use of the product. When used as intended or reasonably foreseeable, Instagram adversely impact, worsen, or aggravate users' mental health.

327. Due to these and other features, the platform is not fit for their ordinary, intended use and Instagram are in fact defective and fail to conform to the platform's implied warranties.

328.   DEFENDANTS have unlawfully breached the platform's implied warranty of merchantability because Instagram were not in merchantable condition when made available, were defective when made available, and do not possess even the most basic degree of fitness for ordinary use.

329.   Despite having received notice of these defects, DEFENDANTS continue to misrepresent the nature of its product and breach its implied warranties.

330.   Plaintiff has had sufficient direct dealings with DEFENDANTS via its website, apps, platform, or through retailers acting as agents authorized to distribute Instagram (Apple/the "App Store") to establish privity.

331.   Further, Plaintiff was a third-party beneficiary of the platform's agreements with other entities for the distribution of Instagram to consumers. Specifically, Plaintiff is the intended beneficiary of the platform's implied warranties. The platform's product is manufactured with the express purpose and intent of being made accessible to consumers.

332.   Plaintiff would not have used Instagram or would not have registered or used on the same terms, had s/he known the facts these Defendants failed to disclose.

333.   DEFENDANTS' breach of these warranties were a substantial factor in causing Plaintiff's harms.

334.   Plaintiff was injured as a direct and proximate result of DEFENDANTS' breach of implied warranties of merchantability. Plaintiff has been harmed by DEFENDANTS' failure to deliver a merchantable product in the form of addiction and other negative health consequences.

335. Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platform induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## SIXTEENTH CAUSE OF ACTION
## FITNESS FOR A PARTICULAR PURPOSE

336. Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

337. Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

338. At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

339. DEFENDANTS violated state law for breach of implied warranties and Plaintiff herein will bring a cause of action for breach of implied warranty of fitness for a particular purpose under applicable State common law.

340. Plaintiff intended to use Instagram as safe social media platform and to improve Plaintiff's mental health, sense of community, and emotional connectedness with others.

341. DEFENDANTS knew at that time of account registration, and/or had reason to know, the particular purpose for which the product was required by Plaintiff, as evidenced by DEFENDANTS' written and/or electronic statements, descriptions, and affirmations of fact on its websites, print or electronic advertising, marketing materials, sign-up notices, and clickwrap (and/or browsewrap or scrollwrap) that Instagram would improve users' mental health, sense of community, and emotional connectedness with others.

342. DEFENDANTS knew at that time of account registration, and/or had reason to know, that Plaintiff was relying on DEFENDANTS' skill or judgment to select or furnish suitable social media platform.

343. DEFENDANTS did not effectively exclude or modify this implied warranty at any point during users' registration and interface with the platform.

344. As described herein, DEFENDANTS breached this implied warranty because the platform uses features that cause social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harms, which may cause or contribute to additional disease.

345. DEFENDANTS knew the Plaintiff's intended purposes for Instagram and impliedly warranted the product to be, in all respects, safe and proper for such purposes.

346.    DEFENDANTS authored the documents and/or made the statements upon which these warranty claims were based and, in doing so, defined the terms of those warranties. The Instagram made available by DEFENDANTS did not conform to DEFENDANTS' promises, descriptions or affirmations and were not adequately designed, developed, tested, promoted and/or fit for the particular purposes for which they were intended.

347.    All of the aforementioned written or electronic materials are known to DEFENDANTS and in their possession, and it is Plaintiff's belief that these materials shall be produced by DEFENDANTS and made part of the record once discovery is completed.

348.    DEFENDANTS' breach of these implied warranties were a substantial factor in causing Plaintiff's harms.

349.    As a direct and proximate result of DEFENDANTS' breach of these warranties, Plaintiff suffered serious injuries and/or sequelae thereto as alleged herein.

350.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platform induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## SEVENTEENTH CAUSE OF ACTION
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

351. Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

352. Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

353. At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

354. DEFENDANTS knew, or should have known through the exercise of reasonable care, the risks to consumers posed by the platform and its features.

355. DEFENDANTS knew or should have known through the exercise of reasonable care, that children, adolescents and children and young people would be attracted to this product.

356. DEFENDANTS knew or, by the exercise of reasonable care, should have known use of Instagram was harmful and had the potential to cause severe emotional distress when used by Plaintiff in a reasonably foreseeable manner, particularly with children, adolescents and young adults.

357. DEFENDANTS knew or, by the exercise of reasonable care, should have known ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of Instagram. Instagram is fine-tuned to addict users, and forcefully cause physical and mental health harms.

358.   DEFENDANTS knew or, by the exercise of reasonable care, should have known that Instagram posed risks including the risks of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects, as described herein, that were known and knowable in light of scientific and medical knowledge that was generally accepted in the scientific community at the time of development, dissemination, public release, and operation of the platform.

359.   DEFENDANTS knew or should have known that Instagram needed to be researched, designed, manufactured, coded, assembled, inspected, tested, marketed, advertised, promoted, supplied, disseminated, and/or made available properly, without defects and with due care to avoid needlessly causing harm.

360.   DEFENDANTS knew or should have known that Instagram could cause serious harm, including severe emotional distress, particularly to young persons, children and adolescents.

361.   DEFENDANTS knew or should have known that many of the youth who were encouraged to use the platform had preexisting mental health issues and/or eating disorders who were at enhanced risk of harm by utilizing the misleadingly described platform, which misrepresented the mental health effects of the platform and failed to warn of the product's features' impacts and risks.

362. DEFENDANTS were negligent, reckless, and careless and failed to take the care and duty owed to Plaintiff, thereby causing Plaintiff to suffer harm, including severe emotional distress.

363. DEFENDANTS' acts and omissions were extreme and outrageous because they constitute a total lack of care, recklessness, and an extreme departure from what a reasonably careful company would do in the same situation to prevent foreseeable harm and severe emotional distress to Plaintiff.

364. DEFENDANTS acted with conscious and reckless disregard for the rights and interests of Plaintiff, and their acts and omissions were extreme and outrageous, had a great probability of causing severe emotional distress, and in fact resulted in such harm to Plaintiff.

365. Based on their strategic and intentional promotion, advertising and marketing history, DEFENDANTS reasonably should have foreseen that children and young people would try Instagram and quickly become addicted to Instagram, resulting in teenagers and young adults developing lifelong addictions. DEFENDANTS were aware of the risks their platform posed, as listed herein. After fine-tuning the platform to be addictive, attention-grabbing, and attention-holding, DEFENDANTS reasonably should have foreseen the emotional distress, mental, and physical issues this would cause on the individuals who would get addicted, as well the stress this would place on their loved ones around them. Particularly, DEFENDANTS should have foreseen that children and young people would be particularly susceptible to experiencing severe emotional distress.

366.    Plaintiff was injured as a direct and proximate result of the reckless, extreme, and outrageous conduct as described herein. Such harm includes anxiety, attempted suicide, attempted self-harm, self-harm, and body dysmorphia, among other harmful effects, which may cause or contribute to additional disease.

367.    DEFENDANTS' conduct, as described above, was intentional, reckless, wanton, malicious, fraudulent, oppressive, extreme, and outrageous, and displayed an entire lack of care and a conscious and depraved indifference to the consequences of their conduct—including to the health, safety, and welfare of their consumers—and warrants an award of punitive damages.

368.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platform induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## EIGHTEENTH CAUSE OF ACTION
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

369.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

370.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

371.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

372.    DEFENDANTS knew or should have known through the exercise of reasonable care, the risks to consumers posed by the platform and its features.

373.    DEFENDANTS knew or should have known through the exercise of reasonable care, that children, adolescents and children and young people would be attracted to this product.

374.    DEFENDANTS knew or, by the exercise of reasonable care, should have known use of Instagram was harmful and had the potential to cause severe emotional distress when used by Plaintiff in a reasonably foreseeable manner, particularly with children, adolescents and young adults.

375.    DEFENDANTS knew or, by the exercise of reasonable care, should have known ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of Instagram. Instagram is fine-tuned to addict users, and forcefully cause physical and mental health harms.

376.    DEFENDANTS knew or, by the exercise of reasonable care, should have known that Instagram posed risks including the risks of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects, as

described herein, that were known and knowable in light of scientific and medical knowledge that was generally accepted in the scientific community at the time of development, dissemination, public release, and operation of the platform.

377. DEFENDANTS knew or should have known that Instagram needed to be researched, designed, manufactured, coded, assembled, inspected, tested, marketed, advertised, promoted, supplied, disseminated, and/or made available properly, without defects and with due care to avoid needlessly causing harm.

378. DEFENDANTS knew or should have known that Instagram could cause serious risk of harm, including severe emotional distress, particularly to young persons, children and adolescents.

379. DEFENDANTS knew or should have known that many of the youth who were encouraged to use the platform had preexisting mental health issues and/or eating disorders who were at enhanced risk of harm by utilizing the misleadingly described platform, which misrepresented the mental health effects of the platform and failed to warn of the product's features' impacts and risks.

380. DEFENDANTS were negligent, reckless, and careless and failed to take the care and duty owed to Plaintiff, thereby causing Plaintiff to suffer harm, including severe emotional distress.

381. DEFENDANTS' acts and omissions were extreme and outrageous because they constitute a total lack of care, recklessness, and an extreme departure from what a reasonably careful company would do in the same situation to prevent foreseeable harm and severe emotional distress to Plaintiff.

382.    DEFENDANTS acted with conscious and reckless disregard for the rights and interests of Plaintiff, and their acts and omissions were extreme and outrageous had a great probability of causing severe emotional distress and in fact resulted in such harm to Plaintiff.

383.    Based on their strategic and intentional promotion, advertising and marketing history, DEFENDANTS reasonably should have foreseen that children and young people would try Instagram and quickly become addicted to Instagram, resulting in teenagers and young adults developing lifelong addictions. DEFENDANTS were aware of the risks their platform posed, as listed herein. After fine-tuning the platform to be addictive, attention grabbing, and attention-holding, DEFENDANTS reasonably should have foreseen the emotional distress, mental, and physical issues this would cause on the individuals who would get addicted, as well the stress this would place on their loved ones around them. Particularly, DEFENDANTS  should have foreseen that children and young people would be particularly susceptible to experiencing severe emotional distress.

384.    Plaintiff was injured as a direct and proximate result of the negligent, reckless, extreme, and outrageous conduct as described herein. Such harm includes anxiety, attempted suicide, attempted self-harm, self-harm, and body dysmorphia, among other harmful effects, which may cause or contribute to additional disease.

385.   Plaintiff   demands   judgment   against   DEFENDANTS   for compensatory, treble, and punitive damages, medical monitoring to diagnose the platform induced injuries at an earlier date to allow for timely treatment and

prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## NINETEENTH CAUSE OF ACTION
## NEGLIGENT FAILURE TO RECALL/RETROFIT

386. Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

387. Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

388. At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

389. DEFENDANTS knew or should have known through the exercise of reasonable care, the risks to consumers posed by the platform and its features.

390. DEFENDANTS knew or should have known through the exercise of reasonable care, that children, adolescents and children and young people would be attracted to this product.

391. DEFENDANTS knew or, by the exercise of reasonable care, should have known use of Instagram was harmful and had the potential to cause social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia

nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects, which may cause or contribute to additional disease.

392.    Defendants owed a duty to the users of the Instagram, including Plaintiff, to exercise reasonable care in conducting their business to properly and reasonably design, research, develop, manufacture, produce, process, assemble, inspect, supply, distribute, deliver, broker, market, warn, maintain, repair, modify, recall, retrofit, engineer, test, recommend, advertise, and/or make available Instagram.

393.    Defendants also owed a continuing duty to Plaintiff to remove, recall, or retrofit the unsafe and/or defective platform across the United States (including in Plaintiff's state).

394.    As discussed, Defendants knew or reasonably should have known that the platform was dangerous and not safe for use (without added protective measures and/or removal of harm causing features, if at all).

395.    Defendants knew or, in the exercise of reasonable and ordinary care, should have known that the platform was defective and unsafe for Plaintiff, who is a person likely to use the platform for the purpose and in the manner for which the platform was intended to be used and for purposes reasonably foreseeable to Defendants.

396.    However, at all times, Defendants negligently breached said duties and unreasonably and negligently allowed the platform to be used by Plaintiff without proper recall or retrofit or warning.

397.    Defendants have also not made any reasonable effort to remove and/or retrofit the serious safety risk posed by the platform to consumers.

398.    In failing to properly recall and/or retrofit Instagram, or even warn of the serious safety risks the platform poses to consumers and the public, Defendants have failed to act as a reasonable manufacturer, designer, or distributer would under the same or similar circumstances and failed to exercise reasonable care.

399.    Plaintiff was injured as a direct and proximate result of the negligent conduct as described herein. Such harm includes anxiety, attempted suicide, attempted self-harm, self-harm, and body dysmorphia, among other harmful effects, which may cause or contribute to additional disease.

400.    Plaintiff    demands    judgment    against    DEFENDANTS    for compensatory, treble, and punitive damages, medical monitoring to diagnose the platform induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## TWENTIETH CAUSE OF ACTION
## MEDICAL MONITORING

401.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

402.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident state. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's resident state.

403.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

404.    Instagram cause or exacerbate mental and physical health harms, including, but not limited to, anxiety, attempted suicide, attempted self-harm, self-harm, and body dysmorphia, among other harmful effects, which may cause or contribute to additional disease.

405.    DEFENDANTS concealed from Plaintiff that, according to its own research:

   a. At least five-to-six percent of fourteen-year-olds admit to addiction to the platform; and

   b. Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram

   c. Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of suicide and self-injury worse;

   d. Seventeen percent of teen-girl Instagram users say the platform makes eating issues worse;

   e. Instagram users are twice as likely to develop an eating disorder as those who don't use social media.

406.    Instagram cause harm by the following product effects:

   a. Engagement-based ranking and intermittent variable rewards are:

  i. highly addictive,

  ii. promote harmful social comparison,

  iii. promote negative, controversial, and/or emotionally activating content,

  iv. promote negative, harmful, and/or dangerous interest groups and/or content creators,

  v. encourage bullying and conflict,

  vi. can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm, and

  vii. present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs);

b. Face tracking and augmentation (image and video filters):

  i. inflict unrealistic and biased beauty standards upon users, and

  ii. cause harmful social comparison based on a misleading curation of peers' appearances and success, especially among teenage female users;

c. The platform causes the mental and physical health harms as listed above;

    d.  The likelihood of these harms and likely severity for these harms are even greater for the developing brains of children and adolescents;

    e.  The likelihood and intensity of these harmful effects are exacerbated by the collaboration of these features; and

    f.  The likelihood and intensity of these harmful effects are increased by other features and innerworkings of the platform which are currently publicly unknown and hidden from users and governments.

407.   Engagement-based ranking and intermittent variable rewards are highly addictive, promote harmful social comparison, encourage bullying and conflict, can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, and present a false reality. Image and video filters inflict unrealistic and biased beauty standards upon users and cause harmful social comparison based on a misleading curation of peers' appearances, especially among teenage female users.

408.   The collaboration of these features multiplies the platform's power to inflict harm by heightening the platform's addictive nature, increasing exposure to content that triggers negative social comparison, exposing users to innately harmful content, increasing time of exposure to harm, further encouraging bullying, and promoting conflict, and multiplying harm in other ways.

409.   The features combine to create a user interface of endless, auto-playing, image and video content, that is algorithmically sorted to place the most

attention-grabbing content at the top and/or in a distilled feed that is very difficult to cease consuming, especially for young users. Content that is promoted by the algorithm is often related to beauty, success/wealth flaunting, or lifestyles, which causes negative physical or social comparison, especially among teens. Meta's algorithms also promote controversial, disturbing, negative, and/or emotionally charged content causing harm to users.

410.   The combined result of these features is to present to users a false reality—it presents to users a world which is constantly controversial and negative; where most other people are exceedingly more attractive than the user; where most other people are exceedingly more successful and/or competent than the user; and which will facilitate and encourage harmful behaviors such as self-harm and eating disorders.

411.   These features take advantage of biological systems, human behavior, and psychology, to addict and condition users to engage in repetitive content-consuming actions such as scrolling, "liking," and sharing content in search of repeated dopamine releases. All the while, the users' input and behavior are tracked to allow the platform to automatically tune itself to each individual user to become as addictive and difficult to stop engaging with as possible.

412.   Potential health harms from these features include, among other types of harm, social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus,

ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

413.    As a direct and proximate result of DEFENDANTS' conduct, Plaintiff has developed mental and physical health issues that will require life-long monitoring treatment.

414.    As a direct and proximate result of DEFENDANTS' conduct, Plaintiff has a significantly increased risk of developing a serious latent disease and/or injury, suffering further injury at an unknown date in the future. Such injuries include the development and/or exacerbation of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

415.    Monitoring procedures exist that makes the early detection and prevention of the above technology-related and/or induced diseases and mental health issues possible. Many of the above physical and mental issues can lead to other physical and mental health injuries long-term that can be detected and prevented by existing medical and psychological testing and treatment.

416.    For example, eating disorders can cause hormone/growth problems, heart problems, neurological problems, abnormal cell growth, and cancer. Anxiety can lead to social impairment, relationships, suicide risk, more frequent hospitalizations, substances abuse (prescribed and non-prescribed), unemployment, som

417.    atoform. Nearly all the other kinds of harms listed above commonly lead to other health issues.

418.    These procedures are different from that normally recommended in the absence of the exposure. These monitoring procedures include non-routine surveillance studies, laboratory testing, and physical examinations, and would be reasonably necessary according to contemporary scientific principles.

419.    Plaintiff has suffered physical, mental, and emotional harms. Anxiety, attempted suicide, attempted self-harm, self-harm, and body dysmorphia (and many of the other harms listed above) are well-known to cause long-lasting conditions, hidden conditions, and health problems that do not manifest fully until much later in life. Existing medical research indicates that these issues can cause permanent digestive tract injury, brain injury, cardiovascular disorders, and many other harms. The injuries such product cause on the human body has already been inflicted in its users, such as Plaintiff, but the full extent of the injury will not manifest until later in Plaintiff's life. Thus, because of DEFENDANTS' conduct, it is reasonably necessary that Plaintiff be placed under periodic screening and/or diagnostic testing beyond that normally recommended in the absence of the issues Plaintiff has suffered due to use of this platform.

420.    Plaintiff demand judgment against DEFENDANTS for medical monitoring damages to diagnose the platform induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

421.    Such other relief as the Court deems proper.

## VII.    TIMELINESS AND TOLLING OF STATUTES OF LIMITATIONS

422.    Through the exercise of reasonable diligence, Plaintiff did not and could not have discovered that Instagram caused her injuries and/or sequelae thereto because, at the time of these injuries and/or sequelae thereto, the cause was unknown to Plaintiff.

423.    Plaintiff did not suspect and had no reason to suspect Instagram caused her injuries and/or sequelae thereto until less than the applicable limitations period prior to the filing of this action.

424.    In addition, DEFENDANTS' fraudulent concealment has tolled the running of any statute of limitations. Through their affirmative misrepresentations and omissions, DEFENDANTS actively concealed from Plaintiff the risks associated with the defects of Instagram and that this product caused her injuries and/or sequelae thereto. Through their ongoing affirmative misrepresentations and omissions, DEFENDANTS committed continual tortious, and fraudulent acts.

425.    As a result of DEFENDANTS' fraudulent concealment, Plaintiff was unaware and could not have reasonably known or learned through reasonable diligence that she had been exposed to the defects and risks alleged herein and that those defects and risks were the direct and proximate result of DEFENDANTS' acts and omissions.

## VIII. DEMAND FOR A JURY TRIAL

426.    Plaintiff hereby demands a trial by jury.

## IX.  PRAYER FOR RELIEF

427.    Plaintiff prays for judgment against DEFENDANTS to the full extent of the law, including but not limited to:

1.    Entering judgment for Plaintiff and against DEFENDANTS;

2.    Entering an Order that Defendants are jointly and severally liable;

3.    Damages to compensate Plaintiff for injuries sustained as a result of the use of the platform, including, but not limited to, physical pain and suffering, mental anguish, loss of enjoyment of life, emotional distress, expenses for hospitalizations and medical treatments, other economic harm that includes, but is not limited to, lost earnings and loss of earning capacity;

4.    Awarding actual and compensatory damages;

5.    Awarding statutory damages in the maximum amount permitted by law;

6.    Awarding exemplary, treble, and/or punitive damages in an amount in excess of the jurisdictional limits;

7.    Awarding reasonable attorneys' fees;

8.    Awarding experts' fees;

9.    Awarding costs of litigation;

10.    Awarding pre-judgment and post-judgment interest at the lawful rate;

11.     A trial by jury on all issues of the case;

12.     Awarding medical monitoring costs or programs; and

13.     Any other relief as this court may deem equitable and just, or that

may be available.

DATE: August 30, 2022

Respectfully Submitted,

By:   /s/ Michael Hanna
Michael Hanna (P81462)
2000 Town Center, Ste. 1900
Southfield, MI 48075
Tel: 313-251-1399
Email: mhanna@forthepeople.com

Emily Jeffcott *(to be admitted)*
Morgan & Morgan
220 W. Garden Street 9th Floor
Pensacola, FL 32502
Tel: 850-316-9100
Email: ejeffcott@forthepeople.com

Narmeen Nkeiti *(to be admitted)*
Morgan & Morgan
20 N. Orange Ave. Ste. 1600
Orlando, FL 32801
Tel: 407-241-3825
Email: nnkeiti@forthepeople.com

***Attorneys for Plaintiff***